02-08-210-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
  
 
 


 

                                              NO.  02-08-00210-CV

 

LOURDES
MARIA VARGAS DE DAMIAN,                        APPELLANTS

INDIVIDUALLY,
AS NEXT FRIEND TO                       AND APPELLEES

NICOLE DENISSE DAMIAN
VARGAS, AND 

AS REPRESENTATIVE OF
THE ESTATE

OF DEMETRIO DAMIAN
CHEN, DECEASED;

GUILLERMO JOSE
GASPERI, INDIVIDUALLY

AND AS REPRESENTATIVE
OF THE 

ESTATE OF GLORIA
GASPERI, DECEASED; 

CARLA GASPERI,
INDIVIDUALLY AND AS 

REPRESENTATIVE OF THE
ESTATE OF 

GLORIA GASPERI,
DECEASED; ANGELA 

CECILIA LASSEN DE
GASPERI, AS LEGAL 

AND PERSONAL
REPRESENTATIVE OF 

THE ESTATE OF GLORIA
GASPERI; 

RICARDO ADOLFO GARAY
BARRIOS; 

LORENZO ROMAGOSA
ACRICH; AND 

IDA ROMAGOSA DE
ARANJO

 

                                                             V.

 

BELL
HELICOPTER TEXTRON, INC.                                                    APPELLEE

 AND APPELLANT

                                                       ------------

 

              FROM
THE 352ND DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                                      OPINION

 

                                                       ------------

 








I. 
Introduction

Appellants[1]
filed this lawsuit against Appellee Bell Helicopter Textron, Inc.[2]
on January 25, 2002, alleging, among other things, strict products liability
and negligence, relating to the crash of a Bell 407 helicopter.  The case
proceeded to a jury trial in August 2007, and the jury returned its verdict on
September 17, 2007.  The jury found that there was a design defect in the
helicopter; that the negligence of Bell and one of the helicopter pilots,
Captain Damian, caused Appellants=
injuries; that Bell and Captain Damian were each fifty-percent responsible for
causing the accident and resulting injuries; and that Appellants=
damages totaled $294,300.  The jury also found that Bell did not act with
malice. The trial court signed the final judgment on February 28, 2008. 

All parties appeal from the judgment. 
Appellants contend in six issues that the trial court erred by not permitting
equitably-adopted children to assert wrongful death claims, that there is
insufficient evidence of comparative negligence, that the damage awards are against
the great weight and preponderance of the evidence, and that the trial court
should have conducted a hearing and ordered a new trial for alleged juror
misconduct.  In its cross-appeal, Bell contends in six issues that all of
Appellants= claims are barred by the Panamanian
statute of limitations, that the trial court should have dismissed the survival
claims by Gloria Gasperi=s estate, that the
design-defect and negligence claims submitted to the jury are preempted by
federal law, and that there is no evidence of design-defects.  We affirm in
part and reverse and render in part.

II. 
Factual Background

Appellant Lorenzo Romagosa testified
that he is the manager of the purchasing and export department of Café Duran, a
coffee company his family owns in Panama City, Panama.  On January 27, 2000,
Lorenzo, his father, and two of his aunts, Ida Rebecca and Gloria Gasperi, flew
on a Bell 407 helicopter from Panama City to conduct business at one of Café
Duran=s
farms in Sona, Panama.  Captains Damian and Garay piloted the helicopter. 
After the family conducted its business at the company farm, Lorenzo=s
father stayed in Sona, and Captains Damian and Garay, Lorenzo, Ida, and Gloria
boarded the helicopter for the return flight to Panama City.  Visibility was
good in the area, and they experienced no problems for most of the flight.

Approximately fifty minutes into the
flight, and only ten minutes from Panama City, Lorenzo heard Captain Garay say,
Abirds
ahead.@ 
Approximately thirty to sixty seconds later, Lorenzo heard Captain Garay say Awatch
out@ in
a high tone of voice.  Lorenzo testified the helicopter then made an abrupt
maneuver, and he felt the helicopter nose pull up drastically, heard a loud
noise, noticed a lot of wind going through the cabin, and saw a bird pass by
him and hit Gloria in the right shoulder.  The helicopter had struck a bird,
which penetrated the windshield and entered into the cabin.  Lorenzo testified
he was thinking at that point that the helicopter would crash; both of his
aunts were screaming, and there were a lot of feathers and wind in the cabin.

Lorenzo testified that Captain Garay
called out Captain Damian=s name and then asked him
for help.  The bird had hit Captain Damian in the head, and he had slumped over
the helicopter controls; the bird did not hit Captain Garay. Lorenzo unbuckled
his seat belt, moved behind Captain Damian=s
seat, and tried to pull Captain Damian back from the controls so that Captain
Garay could fly the helicopter.  Lorenzo testified the helicopter was Agoing
fast, down@ and Captain Garay was trying to control
the helicopter.  Lorenzo testified that just after he pulled Captain Damian
back from the controls, he sat in the seat behind Captain Damian Asplit
seconds@
before the helicopter crashed into the mountainous terrain.  He said that the
helicopter hit the slope and rolled or descended down the hill before stopping.
 All of the helicopter=s occupants were injured in
the crash, and Captain Damian=s and Gloria=s
injuries were fatal.

Bobby Ross testified as Appellants=
aircraft accident reconstruction and helicopter pilot expert.  He testified
that the crashed helicopter was a Bell 407 and that the helicopter was
manufactured in 1997 and delivered in 1998.  Based on his review of the
testimony and physical evidence from the accident, Ross prepared an animation
reflecting his reconstruction of the flight and the crash, and he described the
animation in detail to the jury.  Ross testified that the helicopter was flying
at 120 knots forward air speed and at 1,500 feet above sea level just before
colliding with the bird, a black vulture.  Ross testified that Captains Damian
and Garay were not negligent, that they did all they could to save the
helicopter and its passengers, and that they did not proximately cause the accident.

Ross testified that the helicopter hit
the terrain tail-first; that the bottom of the helicopter then hit, pushing the
landing gear nineteen inches into the body; that the helicopter slid down the
hill; that the doors came off; but that Gloria was still restrained inside the
helicopter at the time.  Ross averred that the helicopter remained upright for
two-thirds of its slide down the hill; that the marks on the wreckage suggest
that it slid on its right side where Captain Damian and Gloria were seated; but
that the right-side door had separated from the helicopter, allowing Gloria to
be partially ejected during the crash sequence. 

On cross-examination, Ross acknowledged
that the Bell 407 has excellent visibility and maneuverability and that the as-cast
acrylic windshield on the Bell 407 gets Ahigh
marks@ for
optical clarity.  Ross testified that a clear windshield is important, that
windshields are very expensive to replace, and that the down time while waiting
for a windshield replacement is unwanted.  Ross said that the Bell 407 is a
Part 27 helicopter, and he agreed that virtually all Part 27 aircraft have
as-cast acrylic windshields like the Bell 407 and that there are no bird-impact
resistance requirements under the Federal Aviation Act (FAA) or the Federal
Aviation Regulations for Part 27 aircraft.  Ross also testified that Part 29
helicopters are larger, that federal regulations require Part 29 helicopters to
have 2.2-pound resistant windshields, that the black vulture that hit the Bell
407 weighed significantly more than 3.5 pounds, and that the bird was
significantly larger than even Part 29 helicopters are designed to resist. 








Billy Hinds, Appellants=
windshield expert, is an aircraft structural design engineer with more than
thirty years= experience designing aircraft
transparencies.  He has designed bird-impact resistant windshields for aircraft
such as the F-111 fighter jet, the F-17 stealth fighter jet, and the B-1
bomber.  He testified at trial that the as-cast acrylic windshield in the Bell
407 was unreasonably dangerous and defectively designed because it was not
bird-impact resistant and that the defective design was a proximate and
producing cause of the crash.  Hinds testified that a 0.14 inch stretched
acrylic windshield and a 0.1 inch polycarbonate windshield are safer
alternative materials than the as-cast acrylic windshield on the Bell 407 and
that both were technologically and economically feasible at the time the Bell
407 was manufactured in 1997.  He also testified that the technology existed in
1997 to properly Amate@
stretched acrylic or polycarbonate windshields to the structure of the
helicopter and resist an impact with a bird. 








William Muzzy, Appellants=
seatbelt expert, testified about the restraint system Gloria was wearing at the
time of the crash and how it improperly allowed her to be partially ejected
from the helicopter during the crash sequence.  Using the animation of the
crash sequence, Muzzy demonstrated each of the times that Gloria=s
restraint would have locked and then unlocked.  Muzzy testified that even
though Gloria still had her seatbelt on, she was partially ejected from the
helicopter during the crash sequence because the locking and unlocking in the
restraint system allowed the seatbelt to continually extend to the point where
it did not restrain her in her seat or even inside the helicopter.  He
testified that the restraint system worked as it was designed but that it
should have been designed so that it would not lock and unlock.  Muzzy
testified that the restraint system in the Bell 407 was unreasonably dangerous
and that the use of the restraint system in the Bell 407 was negligence.  Muzzy
also testified that the MA-16 was a safer alternative design than the restraint
system in the Bell 407 because the MA-16 has an omni-directional sensing
retractor that would not have allowed Gloria=s
seatbelt to unlock during the crash sequence.  Muzzy testified that Athe
lack of an omni-directional vehicle sensing retractor . . . in the aircraft was
the proximate cause of [Gloria] being ejected and [her] subsequent death.@

III. 
Federal Preemption

In its first issue, Bell contends that
the FAA and related federal regulations, through field preemption, impliedly
preempt all common-law claims relating to helicopter design and airworthiness. 
Alternatively, Bell contends that federal regulations have impliedly preempted
the field of helicopter windshield design and bird-strike resistance through
conflict preemption.

A.  Preemption Law

Federal preemption of state law is grounded
in the Supremacy Clause of the United States Constitution, which provides that Athe
Laws of the United States . . . shall be the supreme Law of the Land; and the
Judges in every State shall be bound thereby, any Thing in the Constitution or
Laws of any State to the Contrary notwithstanding.@ 
U.S. Const. art. VI, cl. 2; Delta Air Lines, Inc. v. Black, 116 S.W.3d
745, 748 (Tex. 2003); see MCI Sales & Serv., Inc. v. Hinton, 329
S.W.3d 475, 481 (Tex. 2010).  Under the Supremacy Clause, if a state law conflicts
with federal law, the state law is preempted and will have no effect.  Maryland
v. Louisiana, 451 U.S. 725, 746, 101 S. Ct. 2114, 2128B29
(1981); Black, 116 S.W.3d at 748.  We presume federal law does not bar
the state=s exercise of its historic police powers
unless Congress clearly expresses the intent to preempt such state action.  N.Y.
State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,
514 U.S. 645, 655, 115 S. Ct. 1671, 1676 (1995).

The purpose of Congress is the ultimate
touchstone in every preemption case.  Retail Clerks Int’l Ass’n v.
Schermerhorn, 375 U.S. 96, 103, 84 S. Ct. 219, 223 (1963); Black,
116 S.W.3d at 748.  We discern congressional intent primarily from the statute=s
language and structure.  Medtronic, Inc. v. Lohr, 518 U.S. 470, 486, 116
S. Ct. 2240, 2250B51 (1996); Black, 116
S.W.3d at 748.  Also relevant is the purpose of the statute as a whole, which
is revealed through Athe reviewing court=s
reasoned understanding of the way in which Congress intended the statute and
its surrounding regulatory scheme to affect business, consumers, and the law.@  Medtronic,
Inc., 518 U.S. at 486, 116 S. Ct. at 2251; Black, 116 S.W.3d at 748B49.








APreemption can take one of
several forms.@  Black, 116 S.W.3d at 748.
Express preemption occurs when a federal law may expressly preempts a state
law.  Id.; Great Dane Trailers, Inc. v. Estate of Wells, 52
S.W.3d 737, 743 (Tex. 2001).  A federal law may also impliedly preempt a state
law A(i)
when the scheme of federal regulation is sufficiently comprehensive to support
a reasonable inference that Congress left no room for supplementary state
regulation or (ii) if the state law actually conflicts with federal
regulations.@  Black, 116 S.W.3d at 748; see
Hinton, 329 S.W.3d at 482.  A state law presents an actual conflict when a
party cannot comply with both state and federal regulations, or when the state
law would obstruct Congress=s purposes and objectives.  See
Hinton, 329 S.W.3d at 482; Black, 116 S.W.3d at 748.  Bell does not
contend that Appellants= claims are expressly
preempted.  Thus, we confine our inquiry to the two types of implied
preemption:  field preemption and conflict preemption.  See Black,
116 S.W.3d at 748; Great Dane Trailers, 52 S.W.3d at 743.

B.  Analysis

1.  Field Preemption

Bell first contends that federal law,
through field preemption, impliedly preempts all common-law claims relating to
helicopter design and airworthiness. Appellants counter that although Aclaims
regarding prices, airspace management, pilot qualifications, and failure to
warn@ are
preempted, courts throughout the country have determined that the FAA and
related federal regulations do not preempt claims against manufacturers for
defective product designs.  Neither party cites binding precedent that governs
our analysis.[3]

a.  Texas Civil Practice and
Remedies Code Section 82.008

Citing civil practice and remedies code
section 82.008, Bell argues that ATexas=s
public policy position on the preemptive effect of federal safety regulations
is clear@ because
section 82.008 Acreates a >rebuttable
presumption= of non-liability for defective design
if the product in question >complied with
mandatory safety standards or regulations adopted and promulgated by the
federal government.=@  See
Tex. Civ. Prac. & Rem. Code Ann. ' 82.008(a)
(West 2009).  We disagree for several reasons. 

First, the ultimate touchstone in every
preemption case is the intent of Congress, not Texas public policy.  Schermerhorn,
375 U.S. at 103, 84 S. Ct. at 222B23; Black,
116 S.W.3d at 748.  Second, Appellants filed this lawsuit in 2002 before the
effective date of section 82.008.  See Act of June 2, 2003, 78th Leg.,
R.S., ch. 204, ' 5.02, 2003 Tex. Gen. Laws
847, 861; see also Gen. Motors Corp. v. Burry, 203 S.W.3d 514, 549 (Tex.
App.CFort
Worth 2006, pet. denied) (noting that section 82.008 applies only to suits
filed on or after July 1, 2003).  Third, the rebuttable presumption in section
82.008 arises only after the manufacturer Aestablishes
that the product=s . . . design complied with
mandatory safety standards or regulations . . . that were applicable to the
product at the time of manufacture and that governed the product risk that
allegedly caused harm.@  Tex. Civ. Prac. & Rem.
Code Ann. ' 82.008(a).  But Bell does not point to
any federal statute or regulation setting forth mandatory safety standards
applicable to bird strikes for Part 27 aircraft like the Bell 407 helicopter
involved in this case. Thus, even if section 82.008 applied, Bell has not
established that its design of the Bell 407 complied with applicable mandatory
safety standards or regulations.  Therefore, we are not persuaded that section
82.008, a statute enacted after this lawsuit was filed, suggests or requires a
finding that federal law preempts Appellants=
design defect and negligence claims relating to the Bell 407 Helicopter. 

b.  FAA Certification
Process

Bell also argues that the FAA
certification process is evidence of field preemption.  Under the FAA and
applicable regulations, a manufacturer must receive a Atype
certificate@ before manufacturing a new aircraft,
indicating the FAA=s approval of an aircraft=s
basic design and ensuring that the design complies with all applicable FAA
regulations.  See 49 U.S.C. '
44704(a) (2006); 14 C.F.R. ' 21.21 (2005).  The
manufacturer must then obtain a Aproduction
certificate@ indicating the FAA=s
approval of the manufacturing process that will be used to construct the
approved design.  See 49 U.S.C. '
44704(c); 14 C.F.R. '' 21.139, .143 (2005). 
Finally, the owner of the aircraft must obtain an Aairworthiness
certificate@ to prove the aircraft is in a safe
operating condition and conforms to the type certificate before the aircraft
can be put into service.  See 49 U.S.C. '
44704(d); 14 C.F.R. ' 21.183.

Bell argues that the Atype
certificate@ procedural regulations Aillustrate
that the Federal Aviation Administration is intricately involved with the
design of any new aircraft and any modifications to the design.@ 
However, the court in Monroe v. Cessna Aircraft Co. addressed and
rejected this very argument.  See 417 F. Supp. 2d 824, 833 (E.D. Tex.
2006).  In doing so, the court stated,

The FAA=s three‑phase
certification process for aircraft does not create a pervasive regulatory
scheme demonstrating an intent by Congress to preempt either the field of
aviation safety or state defective design claims. . . . [T]he regulations
requiring the certification process do not themselves set out safety and design
standards. . . . The regulations that do control the design and safety of an
aircraft are broad and provide a non[-]exhaustive list of minimum requirements
leaving discretion to the manufacturer.  For example, the regulations governing
a flight manual=s contents leave room
for Aother information
that is necessary for safe operation because of design, operating, or handling
characteristics.@ . . . [And] the
regulation that lists the required contents of an aircraft flight manual has a
non‑exhaustive list. . . . The certification process looks to these
safety and design regulations set out by the FAA but does not in and of itself
constitute a pervasive regulatory scheme evidencing an intent by Congress to
preempt the field of aviation safety.

 

Id. at 833 (internal citations omitted). 
Significantly, Monroe involved a claim for Afailing
to design and manufacture the aircraft to reduce potential structural damage
resulting from a bird strike.@  Id. at 826B27. 
We agree with the Monroe court=s
analysis and hold that the certification process Adoes
not in and of itself constitute a pervasive regulatory scheme evidencing an
intent by Congress to preempt the field of aviation safety.@  Id.
at 833.

c.  Implied Preemption in
the Fifth Circuit

Bell cites Witty v. Delta Air Lines,
Inc. and argues that Aimplied preemption is alive
and well in the [Fifth] Circuit.@  See
366 F.3d 380, 383B85 (5th Cir. 2004). Witty
sued Delta in a Louisiana federal district court alleging that he developed
deep vein thrombosis while on a flight from Louisiana to Connecticut.  Id.
at 381. Witty alleged that Delta negligently failed to warn passengers about
the risks of deep vein thrombosis in pressurized cabins and negligently failed
to provide adequate leg room to prevent deep vein thrombosis.  Id. at
382.  Delta argued that Witty=s claims were preempted, and
the Fifth Circuit agreed and held that Afederal
regulatory requirements for passenger safety warnings and instructions are
exclusive and preempt all state standards and requirements.@  Id.
at 382, 385.  However, the Witty court narrowly limited the application of
its opinion, stating Awe note our intent to decide
this case narrowly by addressing the precise issues before us.@  Id.
at 385.  Thus, while implied field preemption may be Aalive
and well@ in
the Fifth Circuit as Bell suggests, the Witty opinion itself does not
address whether Appellants= design defect claim
relating to the helicopter=s windshield is preempted.

d.  Other Jurisdictions

Citing Abdullah v. American Airlines,
Inc., 181 F.3d 363 (3rd Cir. 1999), Bell argues that we should hold Athat
the FAA impliedly preempts any common-law claims related to helicopter design
and airworthiness.@  In Abdullah, the
Third Circuit addressed whether federal law preempted the plaintiffs’
common-law claims for failing to take reasonable precautions to avoid known turbulent
conditions and failing to give warnings so that the plaintiffs could protect
themselves from the injuries they sustained due to severe turbulence during
flight.  Id. at 365.  The court found that Arelevant
federal regulations establish complete and thorough safety standards for
interstate and international air transportation that are not subject to
supplementation by, or variation among, jurisdictions.@  Id.
at 367.  Thus, the Abdullah court held that Afederal
law establishes the applicable standards of care in the field of air safety,
generally, thus preempting the entire field from state and territorial
regulation.@  Id.  

However, cases from the Sixth, Ninth,
and Eleventh Circuits conflict with Abdullah.  In each of those cases,
the respective courts held that the FAA did not preempt defective product
claims similar to those asserted by Appellants in this case.  See Martin v.
Midwest Express Holdings, Inc., 555 F.3d 806, 808B12
(9th Cir. 2009) (distinguishing Abdullah and holding plaintiff=s
claims for defective design of aircraft stairs not preempted by FAA); Greene
v. B.F. Goodrich Avionics Sys., Inc., 409 F.3d 784, 788B89,
791, 794B95
(6th Cir. 2005) (citing Abdullah to find FAA preempted failure to warn
claim but applying state law to claim of defectively manufactured navigational
instrument and concluding plaintiff did not offer sufficient evidence of a
manufacturing defect); Pub. Health Trust of Dade Cnty., Fla. v. Lake
Aircraft, Inc., 992 F.2d 291, 292, 295 (11th Cir. 1993) (holding FAA did not
preempt passenger=s defective seat design
claim).  In addition, a federal district court in Texas held that the FAA did
not preempt state-law defective design claims relating to bird-strike safety
standards.  See Monroe, 417 F. Supp. 2d at 836.

Although these cases are not binding
precedent, we find the reasoning from the Sixth, Ninth, and Eleventh Circuits
and the federal district court persuasive.  Although the FAA regulates many
aspects of aviation, A[n]either the [FAA] itself,
nor its legislative history evidence an intent by Congress to preempt the
entire field of aviation safety.  Instead, the [FAA] and its legislative
history demonstrate an acknowledgment by Congress that state law tort claims
are viable under the [FAA].@  Id. at 830; see
Martin, 555 F.3d at 809B12; Lake Aircraft, Inc.,
992 F.2d at 295.  We decline to hold that the FAA impliedly preempts the field
of common-law claims related to helicopter design and airworthiness, and we
overrule this part of Bell=s first issue.

2.  Conflict Preemption

Bell also contends that federal
regulations have impliedly preempted claims regarding helicopter windshield
design and bird-strike resistance through conflict preemption.  Specifically,
Bell argues that because there is a federal regulation requiring Party 29 Atransport
category@
helicopters to be Acapable of safe flight and
landing after impact by a 2.2 pound bird at certain velocities@ and
Athere
is no comparable requirement for >normal=
category helicopters like the [Part 27] Bell 407 at issue in this case,@ the
fact that the Federal Aviation Administration Aimposed
a bird-strike standard on one type of helicopter and not another speaks
volumes.@ 
According to Bell, Ashort of direct conflict
with an actual regulation, there is no better evidence of >conflict=
preemption.@  Appellants respond that the Afailure
to adopt a bird-strike requirement applicable to the [Part 27] Bell 407 cannot
create a basis for conflict preemption.@

Bell cites cases from the United States
Supreme Court, the Fifth Circuit, and the Texas Supreme Court for two
propositions: (1) that a common-law standard that is more stringent than a
federal regulation is preempted if there is evidence that the federal agency
considered and rejected the more stringent standard and (2) that an agency=s A>delicate
balance= of
cost or efficiency versus safety should be respected.@  See
Geier, 529 U.S. at 879B81, 120 S. Ct. at 1924B25; Carden
v. Gen. Motors Corp., 509 F.3d 227, 231B32
(5th Cir. 2007); BIC Pen Corp. v. Carter, 251 S.W.3d 500, 506B07 (Tex.
2008).  However, Bell does not point to any evidence that the Federal Aviation
Administration considered minimum standards for bird-strike resistance on Part
27 aircraft like the Bell 407 at issue in this case.  Instead, Bell points only
to evidence that the Federal Aviation Administration considered bird-strike
safety proposals relating to Part 29 Atransport@
aircraft.  Without evidence that the Federal Aviation Administration considered
and rejected minimum bird-strike standards in Part 27 aircraft like the Bell
407, Bell has not met its Adifficult burden of
overcoming the presumption against preemption.@  Great
Dane Trailers, 52 S.W.3d at 743 (citing Silkwood v. Kerr-McGee Corp.,
464 U.S. 238, 255, 104 S. Ct. 615, 625 (1984)).  To borrow the Monroe court=s
language discussing field preemption, AIf
anything, the specific lack of bird strike regulations related to the [aircraft
at issue] demonstrates the absence of a pervasive regulatory scheme and leaves
room for state law claims on the issue.@  417
F. Supp.2d at 834.

Because there are no federal statutes or
regulations governing the minimum standards for bird-strike resistance in Part
27 helicopters like the Bell 407, we cannot conclude that Texas=s
common-law design defect cause of action makes it impossible for Bell to comply
with both state and federal requirements or that the cause of action is an
obstacle to the purposes and objectives of Congress.  See Sprietsma v.
Mercury Marine, 537 U.S. 51, 65B68,
123 S. Ct. 518, 527B29 (2002) (holding there was
no conflict preemption even where the Coast Guard had decided not to adopt a
regulation requiring propeller guards on motor boats).  We hold that Appellants=
common-law design defect claims relating to the Part 27 Bell 407 helicopter do
not conflict with federal regulations concerning helicopter windshield design
and bird-strike resistance.  We overrule the remainder of Bell=s
first issue.

IV. 
Panamanian Statute of Limitations

Bell contends in its sixth issue that
because the accident occurred on January 27, 2000, and Appellants did not file
this lawsuit until January 25, 2002, all of Appellants=
claims are barred by the one-year Panamanian statute of limitations for
negligence actions.  Because Bell=s
sixth issue requires an interpretation of the Panamanian statute of
limitations, we apply a de novo standard of review.  See Lal v. Harris
Methodist Fort Worth, 230 S.W.3d 468, 471 (Tex. App.CFort
Worth 2007, no pet.).

Under civil practice and remedies code
section 71.031, foreign plaintiffs must commence their suits both within the
time provided by Texas law and Awithin the time provided by
the laws of the foreign state . . . in which the wrongful act, neglect, or
default took place.@  Tex. Civ. Prac. & Rem.
Code Ann. ' 71.031(a)(2), (3) (West 2005); see
Owens Corning v. Carter, 997 S.W.2d 560, 571 (Tex. 1999).  AThus,
a foreign plaintiff whose cause of action for personal injury or wrongful death
arose in a foreign state with a shorter limitations period than Texas=s
must file within the limitations period prescribed by that state=s
law.@  Owens
Corning, 997 S.W.2d at 571B72. 

The parties do not dispute that article
1706 of the Panamanian Civil Code sets forth the Panamanian statute of
limitations governing negligence actions, nor do they seriously dispute the
language of article 1706.[4] 
According to Bell=s ANotice
Regarding Panama Law,@ article 1706 states:

The civil action
seeking damages for slander or libel or civil liability derived from fault or
negligence under article 1644 of the Civil Code, prescribes [that suit be filed
within] a period of one year running from the time the claimant learned of the
loss.  

 

If
a criminal or administrative action for the facts described in the above
paragraph is timely filed, the prescription of the civil action starts to run
from the sentencing of the criminal or administrative action, as the case may
be.[5]

Bell contends that because Appellants did not file suit
within one year of the accident, Appellants=
claims are barred by the statute of limitations.  However, Appellants presented
evidence of a criminal investigation that began on January 27, 2000, the day of
the accident, and that ended in May 2002, several months after Appellants filed
this lawsuit.  Thus, under the plain language of article 1706, Appellants filed
this lawsuit within the statute of limitations as set forth in the Panamanian
Civil Code.  We overrule Bell=s sixth issue.

V. 
Wrongful Death and Survival Claims

A.  Equitably Adopted Children

In their sixth issue, Appellants contend
that the trial court erred by granting a partial summary judgment that Carla
and Guillermo Gasperi, Gloria Gasperi=s
alleged equitably-adopted children, lacked standing to bring a wrongful death
claim.  Appellants do not contend that Gloria legally adopted Carla or
Guillermo.[6]


AAn action to recover damages
[under the wrongful death statute] is for the exclusive benefit of the
surviving spouse, children, and parents of the deceased.@
Tex. Civ. Prac. & Rem. Code Ann. '
71.004(a) (West 2005).  In Goss v. Franz, the Amarillo court of appeals
held that an alleged equitably-adopted child was not entitled to bring a
wrongful death action.  See 287 S.W.2d 289, 290 (Tex. Civ. App.CAmarillo
1956, writ ref=d).  And in Robinson v. Chiarello,
this court held that the appellants, who were Aneither
the natural parents nor legal adoptive parents@ of
the deceased, were barred as a matter of law from recovery under the wrongful
death statute.  806 S.W.2d 304, 310B11
(Tex. App.CFort Worth 1991, writ denied).

Appellants argue that the Texas Supreme
Court Ahas
not yet ruled on whether an equitably adopted child has standing to bring a
claim under@ the Wrongful Death Act, and they ask us
to revisit our holding in Robinson.  See id. at 310B11. 
We disagree with Appellants= contention that the supreme
court has not yet addressed this issue, and we decline to accept Appellants= invitation
to revisit precedent.

Goss, decided by the
Amarillo Court of Appeals in 1956, is a Awrit
refused@
case.  See 287 S.W.2d at 290.  AWrit
refused@
cases decided after 1927 have A>equal
precedential value with the Texas Supreme Court=s
own opinions.=@  Hyundai Motor Co. v.
Vasquez, 189 S.W.3d 743, 754 n.52 (Tex. 2006) (quoting The Greenbook: 
Texas Rules of Form (Tex. Law Review Ass’n, 10th ed. 2005)); see also Yancy
v. United Surgical Partners Int=l,
Inc.,
236 S.W.3d 778, 786 n.6 (Tex. 2007) (recognizing Awrit
refused@
case Ahas
the weight of our own precedent@).  Thus, by refusing the
writ in Goss, the supreme court essentially addressed the very issue
Appellants present in this appeal.  Therefore, Goss=s
holding that an equitably-adopted child may not bring a wrongful death claim is
binding precedent that we as an intermediate appellate court are obligated to
follow.  See Lubbock Cnty., Tex. v. Trammel=s
Lubbock Bail Bonds, 80 S.W.3d 580, 585 (Tex. 2002) (AIt
is not the function of a court of appeals to abrogate or modify established
precedent.@).  Because binding precedent holds
contrary to Appellants= contention that Carla and
Guillermo should have been permitted to bring wrongful death claims as Gloria=s
equitably-adopted children, we overrule Appellants=
sixth issue.

B.  Survival Claims on Behalf of Gloria=s
Estate

In its third issue, Bell contends that
the representatives of Gloria=s estate lacked capacity to
bring a survival claim on behalf of the estate and that the survival claim is
barred by the statute of limitations.  Appellants respond that Bell failed to
preserve its capacity challenge by not objecting to the jury charge and that
the survival claim is not time-barred because Carla=s
post-limitations appointment as administratrix of Gloria=s
estate related back to Appellants= pre-limitations
original petition.

1.  Applicable Facts

Appellants filed this lawsuit on January
25, 2002, and Carla alleged in the original petition that she was a legal
representative of Gloria=s estate.[7] 
Bell filed a motion for summary judgment in April 2006, contending that the
survival claim brought on behalf of Gloria=s
estate should be dismissed because Carla did not have standing to assert it. 
The trial court initially took the issue under advisement but granted the
motion for summary judgment after Bell filed a motion Are-urging@
summary judgment on the survival claim.  On August 8, 2007, Appellants filed a
motion for reconsideration, and Carla filed an application in Tarrant County
Probate Court to be appointed as the administrator of Gloria=s
estate.  And on August 10, 2007, Appellants filed an amended petition that
alleged Carla was a representative of Gloria=s
estate and that added Angela Lassen as a plaintiff as legal and personal
representative of Gloria=s estate.  On August 19,
2007, the trial court granted Appellants=
motion to reconsider the dismissal of the survival claim.  On September 24,
2007, a week after the jury=s verdict but before the
trial court signed the judgment in this case, the Tarrant County Probate Court
appointed Carla as administratrix of Gloria=s
estate.

2.  Challenge to Capacity Not Preserved

Citing Bossier Chrysler Dodge II,
Inc. v. Rauschenberg, Appellants argue that Bell did not preserve its
challenge to the capacity of an estate representative because Bell did not
object on capacity grounds to the jury charge questions concerning Gloria=s
estate.[8] 
See 201 S.W.3d 787, 798B99 (Tex. App.CWaco
2006, pet. granted), rev=d in
part on other grounds, 238 S.W.3d 376 (Tex. 2007).  Bell does not
dispute that it failed to object to the charge on capacity grounds but contends
that capacity was a question of law that it preserved through its motion for
judgment notwithstanding the verdict (JNOV).[9]
 Thus, we must determine whether Bell=s
challenge to capacity should have been raised through an objection to the jury
charge or if it could be timely asserted for the first time in a post-verdict
motion such as a motion for JNOV.

To preserve a no evidence or matter of
law point for appeal, a party must raise the complaint through a motion for
directed verdict, a motion for JNOV, an objection to the submission of the
question to the jury, a motion to disregard the jury=s
answer to a vital fact question, or a motion for new trial.  See United
Parcel Serv., Inc. v. Tasdemiroglu, 25 S.W.3d 914, 916 (Tex. App.CHouston
[14th Dist.] 2000, pet. denied) (citing Cecil v. Smith, 804 S.W.2d 509,
510B11
(Tex.1991)).  But many legal rulings require timely objections before
submission to the jury to preserve error for appeal.  See id. at 916B17
(listing examples).  And unlike standing, a challenge to a party=s
capacity can be waived if not properly challenged in the trial court.  See,
e.g., Austin Nursing Ctr., Inc. v. Lovato, 171 S.W.3d 845, 849 (Tex.
2005) (A[A]
challenge to a party=s capacity must be raised by
a verified pleading in the trial court.@).

In Osterberg v. Peca, the supreme
court stated that Aif the trial court has >to
resolve a legal issue before the jury could properly perform its fact‑finding
role, . . . a party must lodge an objection in time for the
trial court to make an appropriate ruling without having to order a new trial.=@  12
S.W.3d 31, 55 (Tex. 2000) (quoting Holland v. Wal-Mart Stores, Inc., 1
S.W.3d 91, 94 (Tex. 1999), and holding parties failed to preserve argument that
they substantially complied with election code section 254.124 because they did
not object to the jury charge).  Relying in part on Osterberg, the court
in Bossier Chrysler Dodge explained a defendant=s
obligations to preserve error when challenging the plaintiff=s
capacity:

[I]f a verified
denial is filed, the issue of the plaintiff=s capacity to sue is controverted, and the
plaintiff bears the burden of proving at trial that he is entitled to recover
in the capacity in which he has filed suit. As the party with the burden of
proof then, it is incumbent upon the plaintiff to obtain a jury finding on this
particular issue.

 

If,
however, the trial court submits a question assuming the capacity originally
pleaded . . . and the defendant does not object to the question, then the
defendant is bound by that charge on appeal.  Conversely, if the defendant does
object, then the defendant will either obtain the sought‑after jury
finding or have an adverse ruling which can be reviewed on appeal.

 

201 S.W.3d at 798 (citing Osterberg, 12 S.W.3d at
55 and O=Connor v. Miller,
127 S.W.3d 249, 254 (Tex. App.CWaco 2003, pet. denied)). 
The Bossier Chrysler Dodge court held that although the defendant
properly controverted the plaintiff=s
capacity through a verified denial, the defendant did not preserve its capacity
argument because it did not object to the jury charge.  Id. at 798–99.
And even though the defendant challenged the plaintiff=s
capacity in a motion for new trial, the court held that the challenge to the
plaintiff=s capacity through the motion for new
trial Awas
not made in a timely fashion.@  Id. at 798.

Here, the jury charge included questions
that assumed the capacity of the representative of Gloria=s
estate, and Bell did not object to the absence of any questions, definitions,
or instructions on the issue of capacity.[10] 
Had Bell objected to the charge on capacity grounds, the trial court might have
chosen to submit a question, definition, or instruction to the jury concerning
capacity, thus permitting the jury to perform its fact-finding role on the
controverted issue of capacity.  See Osterberg, 12 S.W.3d at 55; Clark
v. Trailways, Inc., 774 S.W.2d 644, 647 (Tex. 1989) (ABy
failing to object . . . parties . . . effectively deny a trial court the
opportunity to review and correct a prior finding.@). 
By not objecting, Bell deprived the trial court of an opportunity to correct
the alleged error relating to capacity.  Thus, we hold that Bell failed to
preserve for appellate review its challenge to the capacity of the
representatives of Gloria=s estate.  We overrule this
part of Bell=s third issue.

3.  Survival Claim Not Barred by Statute
of Limitations

In the remainder of its third issue,
Bell contends that the survival claim asserted on behalf of Gloria=s
estate is barred by the statute of limitations. Specifically, Bell contends
that Carla=s appointment as estate representative
did not relate back to the original petition and that Angela did not join the
lawsuit until seven years after the accident, meaning all claims on behalf of
Gloria=s
estate are time-barred.  Appellants respond that the claims on behalf of Gloria=s
estate are timely because Carla=s post-limitations
appointment as administratrix of Gloria=s
estate related back to the pre-limitations original petition. 

In Lovato, the supreme court held
that when a plaintiff=s timely-filed original
petition alleges her representative status to bring a survival claim and she
acquires capacity to maintain the survival claim after the expiration of the
statute of limitations, the Apost-limitations capacity
cures her pre-limitations lack thereof.@ 171
S.W.3d at 852B53.  The court stated that A[g]enerally,
cases involving post-limitations representative capacity involve an amended
pleading alleging that capacity for the first time,@ but
said that Lovato=s Acase
is somewhat unusual, however, because Lovato has alleged representative status
on behalf of the estate in every petition filed with the trial court.@  Id.
at 852 (emphasis in original). The court noted that Lovato=s
original assertion of representative status, Athough
apparently untrue, asserted that Lovato was bringing suit in her capacity as
the estate=s representative.@  Id. 
Deferring to the trial court on the issue of the reasonable inquiry made before
filing the original petition, the court stated that A[t]he
estate commenced the suit before limitations expired@ and
that ALovato
cured the defect in her capacity before the case was dismissed.@  Id.
at 853.  Therefore, the post-limitations acquisition of capacity cured the
pre-limitations lack of capacity, and the statute of limitations did not bar
the survival claim.  Id.

Bell argues that Lovato is
distinguishable because Lovato was actually an heir of the estate at the time
of filing the original petition.  We disagree.  The supreme court specifically
noted that Lovato=s status as an heir of her
mother=s
estate was in dispute.  Id. at 848, 851.  And the same day the supreme
court decided Lovato, it held in Lorentz v. Dunn that the
survival claim was not time-barred because the plaintiff, who was not an heir
and did not have capacity to represent the estate at the time of filing the
original petition, cured her pre-limitations lack of capacity through her
post-limitations appointment as administrator of the estate.[11] 
171 S.W.3d 854, 856 (Tex. 2005) (relying on Lovato, 171 S.W.3d at 850). 
Thus, we do not agree that Carla=s
alleged lack of status as an heir of Gloria=s
estate distinguishes Lovato from the present case. See Lorentz,
171 S.W.3d at 856; Lovato, 171 S.W.3d at 850.

We also disagree with Bell=s
assertion that Lovato is distinguishable because Carla Adid
not show due diligence in waiting five years to attempt to gain capacity@
while Lovato Aapplied to become administrator just two
months after filing the survival claim and within the statute of limitations,
so the court held that her change of status was applied for and completed
within a reasonable time.@ [Emphasis added.]  There is
no holding in Lovato that Lovato=s
appointment as administrator was Acompleted
within a reasonable time.@  Instead, the supreme court
stated, AIf,
as we have held, a plaintiff=s amended pleading alleging
representative capacity satisfies the relation-back requirements, an original
petition that alleges the correct capacity should suffice for limitations
purposes, provided that capacity, if challenged, is established within a
reasonable time.@  Lovato, 171 S.W.3d
at 853.  And the footnote to that sentence states, AThe
burden is on the defendant to challenge capacity via verified plea, and the
trial court should abate the case and give the plaintiff a reasonable time
to cure any defect.@  Id. at 853 n.7
(emphasis added).  Thus, the supreme court=s
reference to Aa reasonable time@
relates to the proper procedure following a timely plea in abatement and does
not state that a plaintiff=s ability to cure its
pre-limitations lack of capacity is contingent upon seeking capacity within a
reasonable time of filing the original petition.[12] 
See id. at 853 & n.7.  Indeed, Lovato was not appointed
administrator until eighteen months after the expiration of the statute of
limitations.  Id. at 847, 852.  Bell=s
attempt to distinguish Lovato is unpersuasive. 

Bell also relies on Covington v.
Sisters of Charity of the Incarnate Word.  See 179 S.W.3d 583 (Tex.
App.CAmarillo
2005, pet. denied).  There, the decedent=s
daughter, Patricia Covington, was appointed administrator of the estate.  Id.
at 584.  Later, and within the statute of limitations, the decedent=s
sister, Elizabeth Roberts, filed a medical malpractice claim.  Id. 
After the defendants challenged Roberts=s
standing and capacity to act on behalf of her sister=s
estate, Roberts filed an amended petition that added Covington as a plaintiff,
alleging that Covington was the administrator of the estate.  Id. at
585.  Affirming the trial court=s summary judgment in favor
of the defendants, the Covington court distinguished Lovato
because Roberts was not an heir or personal representative of the estate and
never pleaded or contended that she was an heir or personal representative of
the estate.  Id. at 587.  The court further noted that the relation-back
statute Adoes
not directly address the filing of a subsequent pleading that adds a new
plaintiff@ and that A[o]rdinarily,
an amended pleading adding a new party does not relate back to the original
pleading.@  Id. at 588; see Tex.
Civ. Prac. & Rem. Code Ann. ' 16.068
(West 2005).  The court held that because Covington was the administrator of
the estate, Roberts did not have the capacity to bring a survival claim on
behalf of the estate, and the post-limitations petition that added Covington as
a party for the first time did not relate back to Roberts=s
pre-limitations petition.  Covington, 179 S.W.3d at 587B88.

Unlike Covington, Carla filed
this lawsuit within the limitations period, alleged that she was a
representative of Gloria=s estate, and subsequently
acquired capacity to prosecute survival claims on behalf of Gloria=s
estate.[13]
Thus, Carla=s post-limitations acquisition of
capacity cured her alleged pre-limitations lack of capacity, and the survival
claim on behalf of Gloria=s estate is not barred by
the statute of limitations.  See Lorentz, 171 S.W.3d at 856; Lovato,
171 S.W.3d at 852B53.[14] 
And because Carla=s post-limitations capacity
cured her alleged pre-limitations lack of capacity, we need not decide whether
Angela=s
intervention as a plaintiff in August 2007 related back to Carla=s
original petition or whether Carla had pre-limitations capacity to bring the
survival claim as Gloria=s alleged equitably-adopted
daughter.  See Tex. R. App. P. 47.1 (requiring appellate court to
address Aevery
issue raised and necessary to final disposition of the appeal@). 
We overrule the remainder of Bell=s
third issue.

VI. 
Design Defects

Bell contends in its second, fourth, and
fifth issues that, because Appellants=
expert witnesses lacked necessary qualifications and their testimony was
unreliable, conclusory, or speculative, there is no evidence to support the
jury=s
design defect findings.[15] 
Specifically, Bell argues that there is no evidence that the helicopter
windshield or door mounts were defectively designed, that there is no evidence
that safer alternative designs were feasible for the windshield or door mounts,
and that there is Ano evidence that [Appellants=]
proposed alternative restraint system was available for use on civilian
helicopters and no evidence that it would have prevented Gloria Gasperi=s
injuries.@ 

A.  Applicable Law

To recover on their products liability
claim alleging a design defect, Appellants were required to prove by a
preponderance of the evidence that A(1)
the product was defectively designed so as to render it unreasonably dangerous;
(2) a safer alternative design existed; and (3) the defect was a producing
cause of the injury for which the plaintiff seeks recovery.@  Timpte
Indus., Inc. v. Gish, 286 S.W.3d 306, 311 (Tex. 2009); see Hernandez
v. Tokai Corp., 2 S.W.3d 251, 255–56 (Tex. 1999); Burry, 203 S.W.3d
at 529; see also Tex. Civ. Prac. & Rem. Code Ann. ' 82.005(a)
(West 2011).  A Asafer alternative design@ is:

a product design
other than the one actually used that in reasonable probability:

 

(1) would have
prevented or significantly reduced the risk of the claimant=s personal injury,
property damage, or death without substantially impairing the product=s utility; and 

 








(2) was economically
and technologically feasible at the time the product left the control of the
manufacturer or seller by the application of existing or reasonably achievable
scientific knowledge.

 

Tex. Civ. Prac. & Rem. Code Ann. ' 82.005(b).

B.  Expert Testimony and Standard of Review

If an expert=s
testimony would assist the factfinder in understanding the evidence or
determining a fact issue, that expert may testify on scientific, technical, or
other specialized subjects.  Tex. R. Evid. 702; Mack Trucks, Inc. v. Tamez,
206 S.W.3d 572, 578 (Tex. 2006).  Under Rule 702, the proponent of the expert=s
testimony has the burden to establish that the expert is qualified to render an
opinion on the subject matter.  Tex. R. Evid. 702; E.I. duPont de Nemours
& Co. v. Robinson, 923 S.W.2d 549, 556 (Tex. 1995).  Whether a witness
is qualified is a matter of judicial discretion, and the trial court=s
determination on that issue will not be disturbed on appeal absent a clear
abuse of that discretion.  Robinson, 923 S.W.2d at 558; see Broders
v. Heise, 924 S.W.2d 148, 151 (Tex. 1996).  A trial court does not abuse
its discretion merely because a reviewing court in the same circumstances would
have ruled differently.  Robinson, 923 S.W.2d at 558; Downer v.
Aquamarine Operators, Inc., 701 S.W.2d 238, 242 (Tex. 1985), cert.
denied, 476 U.S. 1159 (1986).  The trial court abuses its discretion if its
decision was arbitrary or unreasonable without reference to guiding rules and
principles.  Downer, 701 S.W.2d at 241B42.

A[E]ach material part of an
expert=s
theory must be reliable.@  Whirlpool Corp. v.
Camacho, 298 S.W.3d 631, 637 (Tex. 2009).  When expert testimony is
involved, courts are to Arigorously examine@
both the validity of the facts and assumptions on which the testimony is based
and Athe
manner in which the principles and methodologies are applied by the expert to
reach the conclusions.@ Id. (citing Exxon
Pipeline Co. v. Zwahr, 88 S.W.3d 623, 629 (Tex. 2002)).  In doing so, we
consider the expert=s experience and the factors
set forth by the supreme court in Robinson.  Id. at 638 (citing Gammill
v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 720 (Tex. 1998)); see
Robinson, 923 S.W.2d at 557.[16] 
A[I]n
very few cases will the evidence be such that the trial court=s
reliability determination can properly be based only on the experience of a
qualified expert to the exclusion of factors such as those set out in Robinson.@  Whirlpool,
298 S.W.3d at 638 (citing Mack Trucks, 206 S.W.3d at 579 and Gammill,
972 S.W.2d at 726).  

Although a trial court=s
ruling on the reliability of an expert=s
opinion testimony is generally reviewed for an abuse of discretion, a party may
assert on appeal, as Bell does in this case, that the unreliability of an
expert=s
opinion makes it legally insufficient to support the verdict.  Id.  A[I]n
a no-evidence review[,] we independently consider whether the evidence at trial
would enable reasonable and fair-minded jurors to reach the verdict.@  Id.
(citing City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005)). 
This review Aencompasses the entire record, including
contrary evidence tending to show the expert opinion is incompetent or
unreliable.@  Id.; see also Cooper Tire
& Rubber Co. v. Mendez, 204 S.W.3d 797, 804 (Tex. 2006) (A[W]e
may consider the testimony of the[] opposing experts because >an
appellate court conducting a no‑evidence review cannot consider only an
expert=s
bare opinion, but must also consider contrary evidence showing it has no
scientific basis.=@)
(quoting City of Keller, 168 S.W.3d at 813).

C.  Helicopter Windshield

Bell argues in part of its second issue
that there is no evidence of a safer alternative design for the helicopter
windshield because the opinion testimony by Appellants=
expert, Billy Hinds, was insufficient as a matter of law.  Specifically, Bell
argues that Hinds lacked the necessary qualifications to testify about safer
alternative designs because he has no experience designing helicopter
structures and only limited experience with windshields on much larger
helicopters, that his testimony is not based on sound engineering principles,
and that his testimony is conclusory and speculative. 

1.  Preservation of Error

Appellants argue that Bell waived its
challenge to the reliability of Hinds=s
testimony.  ATo preserve a complaint that an expert=s
testimony is unreliable, a party must object to the testimony before trial or
when it is offered.@  Guadalupe‑Blanco
River Auth. v. Kraft, 77 S.W.3d 805, 807 (Tex. 2002); see Mar.
Overseas Corp. v. Ellis, 971 S.W.2d 402, 409 (Tex. 1998).  Bell filed a
pretrial motion to strike Hinds=s testimony that the trial
court denied.  In the pretrial motion, Bell invoked the Robinson factors
and the Gammill analytical gap standard and argued that Hinds=s
testimony Ais inherently unreliable and mere
speculation.@  Bell=s
pretrial motion to strike Hinds=s testimony preserved its
challenge to the reliability of Hinds=s
testimony.  See Kraft, 77 S.W.3d at 807; Ellis, 971 S.W.2d at
409; see also City of Sugar Land v. Home & Hearth Sugarland, L.P.,
215 S.W.3d 503, 511 n.4 (Tex. App.CEastland
2007, pet. denied) (holding pretrial motion to exclude preserved appellate
complaint concerning reliability of expert testimony).  Further, Bell objected
at trial to Hinds=s qualifications to testify
about the structure of the Bell 407.  Finally, to the extent Bell contends that
Hinds=s
testimony is speculative or conclusory on its face, no trial objection was
required.  See Coastal Transp. Co., v. Crown Cent. Petrol. Corp., 136
S.W.3d 227, 233 (Tex. 2004).  We therefore hold that Bell preserved its
challenges to Hinds=s qualifications and the
reliability of his testimony.

2.  Hinds=s
Testimony

Hinds is an expert in bird-impact
transparency design for aircraft.  He has extensive experience designing
transparencies for airplanes, but he has no experience with light helicopters
and limited experience with helicopters generally.  Specifically, Hinds has not
been trained and has not performed work on the structural design of
helicopters, has never designed how the structural frame of a helicopter (or
any other aircraft) would accept a windshield or frame, has only designed
transparencies for two large helicopters (the S-92 and the RAH-66), and has not
done any work with light helicopters similar to the Bell 407. 

a.  Materials

Hinds testified that the as-cast acrylic
used for the windshield in the Bell 407 was unreasonably dangerous and
defectively designed because it was not bird-impact resistant.  He also
testified that stretched acrylic and polycarbonate are safer materials and that
the technology existed in 1997 to properly mate (or attach) a 0.14 inch
stretched acrylic or 0.1 inch polycarbonate windshield to the structure of the
helicopter in order to resist an impact with a bird. 

b.  AMating@ the
Windshield to the Helicopter

Hinds testified that the mounting
structure of the Bell 407 would need to be modified in order to mate a
stretched acrylic or polycarbonate windshield to the helicopter and make it
bird resistant.  Concerning the modifications necessary for a 0.14 inch
stretched acrylic windshield, Hinds testified that A[s]tretched
acrylic has basically the same structure characteristics as the as-cast
acrylic, and there probably wouldn=t
have had to be much change to the structure at all because of that.@ 
For a polycarbonate windshield, Hinds averred that because of the deflection in
the polycarbonate windshield following a bird-strike, the portion of the
helicopter frame that overlaps the windshield would have to be extended
approximately 1.5 inches to keep the windshield retained in the structure.  But
Hinds acknowledged that he did not know if the helicopter structure would
support a polycarbonate windshield in the event of a bird strike.  He testified
that the 1.5 inch change to the mating structure is an Aapproximation,@
that it is his Ainitial suggestion,@
that he Awasn=t
designing a window for Bell Helicopter,@ and
that Awithout
actually bird testing it and seeing how the edges perform in the actual bird
testing, you don=t really know for sure if
the design is right.@  

3.  Legal Sufficiency of Hinds=s
Opinion Testimony

Crucial to Hinds=s
safer alternative design opinions is his suggestion that either the 0.14 inch stretched
acrylic or the 0.1 inch polycarbonate windshield could be successfully mated to
the Bell 407Cand retained to the helicopter in the
event of a bird strikeCby adding approximately 1.5
inches to the bonding area around the window frame.  Two of Appellants=
other experts, Anthony Bosik and John Raffo, agreed that an alternative design
is not safer if it detaches from the helicopter following an impact, and Hinds
agreed that it does not matter what material is used for the windshield if it
does not prevent a bird from incapacitating the pilot.  In other words, neither
the stretched acrylic nor the polycarbonate design is safer than the as-cast
acrylic design if they dislodge from the helicopter on impact with a bird.  See
Tex. Civ. Prac. & Rem. Code Ann. ' 82.005(b)(1)
(providing that alternative design must have Aprevented
or significantly reduced the risk@ of
the injury).  Hinds agreed that in the event of a bird strike, there must be
sufficient retention in the area where the windshield is bonded to the frame so
that the bonding area is not overloaded by the deflection of the windshield
caused by the impact.  But Hinds never explained why his proposed addition of
approximately 1.5 inches to the mating structure would be sufficient to retain
a 0.14 inch stretched acrylic or 0.1 inch polycarbonate windshield on the
helicopter in the event of a bird strike. 








Concerning the frame alterations
necessary to accommodate a 0.14 inch stretched acrylic windshield, Hinds
testified that Athere probably wouldn=t
have had to be much change to the structure,@ but
he never explained the basis of his opinion.  Other than saying that A[s]tretched
acrylic has basically the same structure characteristics as the as-cast
acrylic,@
Hinds did not say what, if any, structural changes are necessary, and if no
changes are needed, he did not explain why none are needed.  For a 0.1 inch
polycarbonate windshield, Hinds testified that the overlap for the bonding area
would need to be extended by approximately 1.5 inches because of the deflection
rate of the polycarbonate, but he again failed to explain the basis of his
opinion.  For example, Hinds did not conduct or cite to any publications,
engineering studies, or other analyses of the rigidity or deflection rates of a
0.14 inch stretched acrylic or 0.1 inch polycarbonate windshield as compared to
the rigidity or deflection rates of the as-cast acrylic in the Bell 407 that
support his opinion. 

AExpert opinions must be
supported by facts in evidence, not conjecture.@  Marathon
Corp. v. Pitzner, 106 S.W.3d 724, 729 (Tex. 2003) (citing Burroughs
Wellcome Co. v. Crye, 907 S.W.2d 497, 499B500
(Tex. 1995)).  An expert=s simple ipse dixit is
insufficient to establish a matter; rather, the expert must explain the basis
of his statements to link his conclusions to the facts.  See City of San
Antonio v. Pollock, 284 S.W.3d 809, 818 (Tex. 2009) (quoting Burrow v.
Arce, 997 S.W.2d 229, 235 (Tex. 1999)); Earle v. Ratliff, 998 S.W.2d
882, 890 (Tex. 1999).  A[I]f no basis for the
opinion is offered, or the basis offered provides no support, the opinion is
merely a conclusory statement and cannot be considered probative evidence.@  Pollock,
284 S.W.3d at 818; cf. Burry, 203 S.W.3d at 534B35 (holding
that expert sufficiently explained how the proposed alternative safer design
would function).

Assuming Hinds was qualified as an
expert to testify regarding an alternative safer helicopter windshield design
absent any training or experience in helicopter design, his testimony
concerning the necessary changes to mate a 0.14 inch stretched acrylic or 0.1
inch polycarbonate windshield to the Bell 407 and resist a bird impact is
conclusory, speculative, and no evidence that a 0.14 inch stretched acrylic or
0.1 inch polycarbonate windshield is a safer alternative design than the
as-cast acrylic windshield on the Bell 407.[17] 
See Tex. Civ. Prac. & Rem. Code Ann. '
82.005(b); Pollock, 284 S.W.3d at 818; Earle, 998 S.W.2d at 890.

The conclusory and speculative nature of
Hinds=s
testimony is illustrated by the testimony of other experts in the case and
other parts of Hinds=s testimony.  See
Whirlpool, 298 S.W.3d at 640B42
(considering evidence rebutting expert=s
opinion as evidence that Ahighlights the extent to
which [the expert=s] theory was subject to
testing and examining for reliability@); Cooper
Tire, 204 S.W.3d at 803B04 (considering testimony of
opposing experts when reviewing scientific basis for expert=s
testimony); Kraft, 77 S.W.3d at 806B07
(considering expert=s testimony during voir dire
in analyzing reliability of the expert=s
opinion).  All engineering experts who testified, even Hinds, agreed that
designing the entire helicopter structure to withstand the load of an impact is
a critical factor in designing a bird-resistant windshield.

Hinds acknowledged that whether his
proposed 0.1 inch monolithic, polycarbonate windshield would work would require
looking at how the whole frame fits with the supporting structure.  Appellants=
expert Bosik testified that designing the entire helicopter structure to
withstand the load of an impact is a critical issue and that proving whether or
not a bird will penetrate the material is only one of several steps in proving
the existence of a safer alternative design. Appellants=
expert Raffo, manager of a windshield manufacturer for all types of aircraft
(including helicopters for Bell in the past), agreed that a safer alternative
design of a windshield would require a complete structural design that would
consider the structure of the helicopter because the force that is not taken up
in the deflection of the windshield on impact will transfer to the structure of
the helicopter. 








In addition, Bell expert Warren Wandel,
an accident investigator formerly with the National Transportation Safety
Board, testified that of all civilian helicopters in the world, ninety-five
percent are Part 27 helicopters (or the foreign equivalent) similar to the Bell
407; that Part 27 helicopters are popular and fit a certain niche because of their
size, speed, weight, operating costs, and number of passengers; and that they
are used extensively by law enforcement, pipeline and power line patrol,
offshore support of the petroleum industry, and television and radio stations.[18] 
Bell structural engineer Steven Webster testified that neither the materials
nor the structure of light helicopters like the Bell 407 are designed for bird-impact
resistance, polycarbonate is not synonymous with bird-impact resistance, and
many efforts to use it over the years have been unsuccessful.  Webster further
testified that the helicopter structure would have to be changed to withstand
an impact of the magnitude that occurred here.  Finally, Bell structural
engineer Alan Allman explained that a 3.5 pound bird striking a helicopter at
120 knots generates 2230 foot-pounds of force and reiterated that a
polycarbonate windshield is not the same as a bird-resistant windshield.  He
explained that the windshield is only one part of the system and agreed that
even assuming the windshield material would resist the impact, the Amajor
engineering portion@ in designing a
bird-resistant helicopter is building the entire structure of the helicopter
around the bird-resistant transparency so that it will Awithstand
the load@
created by the impact.  Designing the helicopter to resist the 2230 foot-pounds
of force would require additional weight to be added to the structure in the
front and the rear, that the additional weight will require a larger engine
with more horse-power, and that Aby
the time you build that entire structure[,] you now have a [Bell] 430
helicopter.@[19] 

Nevertheless, Hinds did not evaluate the
impact of his proposal for an alternate design on the rest of the Bell 407’s
structural design.  Although Hinds agreed that a windshield design must
consider how the windshield and its frame fit with the helicopter=s
supporting structure, he admitted that he did not do so in this case.  Indeed,
he admitted that he does not have any experience with helicopter design, and he
testified that he only looked at available technology for the makeup of the
windshield and admitted that he could not answer structural questions about the
Bell 407.  Hinds also agreed during his voir dire examination outside the
presence of the jury that a bird impact will transfer loads from the windshield
to the structure of the helicopter, but he admitted that he did not calculate
the loads transferred to the frame and did not know what the loads would do to
the frame.  Hinds=s failure to analyze the
structure of the Bell 407 or to even calculate the load transferred to the
structure following a bird strike is a significant gap in his analysis, see
generally Gammill, 972 S.W.2d at 727, and it illuminates the conclusory and
speculative nature of his testimony that a stretched acrylic or polycarbonate
windshield could be retained to the Bell 407 after a bird strike by adding
approximately 1.5 inches to the bonding area. 

Other deficiencies in Hinds=s
testimony further illustrate the conclusory and speculative nature of his
opinions.  Hinds testified on voir dire that the structures of helicopters and
airplanes are very similar, stating that the fundamental design principles for
any aircraft are basically the same; that they must Atake
landing and takeoff loads@; that they must Atake
air pressure loads@; that you must Acalculate
the strength of the materials, the joint interfaces[,] and how they react@;
that Ayou
have to worry about how these loads are going to take pressure@;
and that these are Abasic engineering principles.@  In
Volkswagon of America, Inc. v. Ramirez, the challenged expert testified
his accident reconstruction opinions involved application of Abasic
scientific and engineering principles, but all abiding by the laws of physics,@ but
the expert had not read publications or seen studies that corroborated his
opinion, did not conduct or cite any tests to support his theory, and did not
explain how the tests he did conduct supported his conclusions.  159 S.W.3d
897, 905B06
(Tex. 2004).  Holding that the expert=s
opinion was unreliable and thus no evidence, the supreme court stated that the
expert=s Areliance
on the >laws
of physics,= without more, is an insufficient
explanation.@  Id. at 906.  Here, although
Hinds testified that his opinions are based on basic engineering principles, he
never explained how those principles or any tests or publications supported his
opinion that a stretched acrylic or polycarbonate windshield could be
successfully mated to the Bell 407 and make it bird resistant by adding approximately
1.5 inches to the bonding area.








Hinds=s
opinions also differ from those he employs in non-litigation contexts.  Hinds
testified that his proposed stretched acrylic or polycarbonate windshield
designs would be bonded to the helicopter, but he admitted that all of the
transparencies his company makes are bolted to the aircraft and that he has no
experience designing transparencies for light helicopters.  Thus, Hinds does
not have non-judicial experience with his proposed design or anything similar. 
See Robinson, 923 S.W.2d at 557 n.2 (AThat
an expert testifies based on research he has conducted independent of the
litigation provides important, objective proof that the research comports with
the dictates of good science.@) (quoting Daubert v. Merrell
Dow Pharm., Inc., 43 F.3d 1311, 1317 (9th Cir. 1995) (op. on remand)). 
Indeed, all of Hinds=s opinions were developed
for the litigation in this case.  Hinds testified that he believes every
helicopter is unreasonably dangerous if it cannot sustain a four-pound bird
strike at full cruising speed but acknowledged that he did not hold that
opinion before this litigation.[20]
 Moreover, despite his litigation opinions, Hinds testified that his company
delivered a 2.2 pound bird-resistant windshield for the Sikorsky S-92 while
this litigation was pending and after he was hired as an expert.  Thus, his
opinions have no non-judicial application and differ from those he practices in
non-judicial settings.  See id. at 557.

As to relevant testing of his theory, Hinds
testified that he has not tested a 0.1 inch monolithic polycarbonate windshield
in any aircraft,[21]
that he does not know if anyone else has, and that he is not aware of any
helicopters in existence that use a monolithic polycarbonate transparency.  An
expert is not always required to do testing to support his opinions, Abut
lack of relevant testing to the extent it was possible, either by the expert or
others, is one factor that points toward a determination that an expert opinion
is unreliable.@  Whirlpool, 298 S.W.3d at 642. 
Hinds testified that although his theory has not been tested, he knows that his
design will work because he has the necessary knowledge and experience and
because many of the other transparencies he has designed had not been designed
before.  But see Ramirez, 159 S.W.3d at 904B06
(holding that expert=s theory rested on his Asubjective
interpretation of the facts@ when he did not connect his
theory to any physical evidence in the case or to any tests or calculations
prepared to substantiate his theory).  

Citing General Motors Corp. v.
Sanchez, Appellants argue that they presented legally sufficient evidence
of a safer alternative design because Athere
is no requirement that a plaintiff actually design or build or test the
alternative.@ See 997 S.W.2d 584, 592 (Tex.
1999).[22] 
But Sanchez is distinguishable.  The Sanchez Court=s
statement about testing related to a plaintiff=s
burden to show the existence of a safer alternative design and did not concern
the Robinson factors or their application to the reliability of the
expert=s
opinion testimony.  Id. at 591B92. 
Indeed, G.M. failed in that case to preserve its challenge to the reliability
of the expert=s testimony.  Id. at 591.  

Unlike in Sanchez, Bell preserved
its challenge to the reliability of Hinds=s
testimony.  Further, unlike the expert in Sanchez, Hinds did not
disclose any testing, calculations, engineering analysis, or publications that
supported his opinion that adding approximately 1.5 inches to the bonding area
would retain a 0.14 inch stretched acrylic or 0.1 inch polycarbonate windshield
to the Bell 407 after a bird strike.[23] 
The absence of Hinds=s underlying analysis and
the availability of testing Ahighlights the extent to
which [Hinds=s] theory was subject to testing and
examining for reliability.@  Whirlpool, 298
S.W.3d at 642.

In summary, Hinds=s
testimony does not link his conclusions to the facts of the case or the
analysis, if any, that he performed to determine that either a 0.14 inch
stretched acrylic or 0.1 inch polycarbonate windshield could be successfully
mated to the Bell 407 by adding 1.5 inches to the mounting structure.  His
theory relies heavily upon his own subjective interpretation, has not been
generally accepted within the relevant aircraft community, does not have any
non-judicial uses, could have been tested but was not, and differs from what he
employs outside of litigation.  See id. at 640B43
(holding expert=s testimony conclusory,
speculative, and not entitled to probative weight after applying Robinson
factors); Coastal Transp. Co., 136 S.W.3d at 231B33
(holding expert=s testimony was too
conclusory to support a judgment).  We hold that Hinds=s
testimony that either a stretched acrylic or polycarbonate windshield could be
mated to the Bell 407 by adding 1.5 inches to the helicopter frame is
conclusory, speculative, and not entitled to probative weight.  See
Whirlpool, 298 S.W.3d at 643.  Therefore, Hinds=s
testimony is no evidence of a safer alternative design.

4.  Other Evidence of Safer Alternative
Design

Having determined that Hinds=s
testimony concerning a safer alternative design is not entitled to probative
weight, we must determine whether Appellants offered other legally sufficient
evidence of a safer alternative design. 








Appellants argue that they presented
sufficient evidence that a monolithic polycarbonate windshield was feasible at
the time of manufacture in 1997 because they offered evidence that Athe
Aerospatiale AS-350, which like the Bell 407 is a Part 27 helicopter with a
similar windshield design to the Bell 407, was offered with a monolithic,
single-layer polycarbonate windshield in 1977.@ 
First, there is no evidence in the record that the monolithic polycarbonate
windshield on the AS-350 was resistant to a 3.5 pound bird strike or would
remain attached to the helicopter following a 3.5 pound bird strike.  See
Tex. Civ. Prac. & Rem. Code Ann. ' 82.005(b)(1)
(providing that alternative design must have Aprevented
or significantly reduced the risk@ of
the injury); see also Smith v. Louisville Ladder Co., 237 F.3d 515, 519B20
(5th Cir. 2001) (applying Texas law and holding safer alternative design not
proven when expert could not say that alternative design would have prevented
the plaintiff=s fall).  Moreover, Aerospatiale
abandoned the polycarbonate windshields in the AS-350 because of the
polycarbonate=s reaction to cleaning agents, and
current models of the AS-350 have as-cast acrylic windshields similar to those
in the Bell 407.  See Tex. Civ. Prac. & Rem. Code Ann. ' 82.005(b)(2)
(providing that safer alternative design must be technologically feasible). 
Further, Appellants presented no evidence of the costs of incorporating the
AS-350 design into the Bell 407.  See Honda of Am. Mfg., Inc. v. Norman,
104 S.W.3d 600, 607 (Tex. App.CHouston [1st Dist.] 2003,
pet. denied).[24] 
Without evidence concerning the cost of incorporating the AS-350 design into
the Bell 407, there is no evidence of the economic feasibility of the AS-350
design.  See id.; Smith v. Aqua-Flo, Inc., 23 S.W.3d 473, 478
(Tex. App.CHouston [1st Dist.] 2000, pet. denied); Jaimes
v. Fiesta Mart, Inc., 21 S.W.3d 301, 306 (Tex. App.CHouston
[1st Dist.] 1999, pet. denied).  Thus, the existence of the AS-350 is no
evidence of a safer alternative design for the Bell 407 as it relates to the
facts of this case.

Appellants also argue that they
presented evidence of feasibility because Bell currently has a prototype Bell
407 with polycarbonate windshields.  But the prototype Bell 407 was developed
after the accident helicopter was manufactured in 1997, and it has not been
tested for bird resistance.  Indeed, there was testimony at trial that, even at
the time of trial in September 2007, no helicopter manufacturers were building
Part 27 helicopters like the Bell 407 with polycarbonate windshields and that
no helicopter manufacturers were building Part 27 helicopters with any kind of
bird-resistant or bird-proof windshields. Without evidence that the prototype
helicopter is actually bird resistant, the existence of a prototype with polycarbonate
windshields, first developed after the accident helicopter was manufactured in
1997, is no evidence of a technologically feasible safer alternative design at
the time of manufacture that would reduce the risk of injury.[25] 
See Tex. Civ. Prac. & Rem. Code Ann. ' 82.005(b)(1);
see also Smith, 237 F.3d at 519B20. 

Finally, Appellants point to evidence
that Bell produced the bird-resistant Bell 222 in the 1980’s because the United
Kingdom required all helicopters at the time to be bird-resistant.  However,
the Bell 222 was a Part 29 helicopter and was only resistant to a 2.2 pound
bird strike.  The Bell 407 is a Part 27 helicopter, and the bird involved in
this accident weighed substantially more than 2.2 pounds.  Thus, the existence
of the Bell 222 is no evidence of a safer alternative design for the Bell 407.[26] 
See Tex. Civ. Prac. & Rem. Code Ann. ' 82.005(b)(2);
Smith, 237 F.3d at 519B20; see also Brockert,
287 S.W.3d at 770 (citing Shears, 911 S.W.2d at 384B85).

Absent competent expert testimony as to
whether it was feasible in 1997 to mount a 0.1 inch polycarbonate or 0.14 inch
stretched acrylic windshield to a Bell 407 so that the windshield would both
resist a 3.5 pound bird and also not become dislodged from the helicopter,
Appellants presented no evidence of a safer alternative design for the
windshield on the Bell 407 that would have sustained an impact with a 3.5 pound
bird and prevented or significantly reduced the risk of injury to Appellants. 
We therefore sustain this part of Bell=s
second issue.[27]

D.  Helicopter Door Mounts

Bell contends in its fifth issue that
there is no evidence that the door mounts on the helicopter were defectively
designed or that a safer alternative design existed because the only evidence
Appellants presented was Atextbook speculation or
conjecture.@ 

Ross, Appellants=
accident reconstruction expert, testified that he examined the wreckage of a
Bell 206 and that the Bell 407 is a derivative of the Bell 206. Ross testified
that the wrecked Bell 206 he examined was in about the same condition as the
wrecked Bell 407 in this case, that the sides of the Bell 206 were made of
aluminum, that the sides of the Bell 407 were made of a carbon-fiber material,
that the doors of the Bell 206 did not come off in its crash, but that the
doors of the Bell 407 came off in the instant crash.  However, Ross never
testified that the Bell 407 was defectively designed because its sides were
made of carbon-fiber material.  Further, although Ross implicitly suggested
that the aluminum construction of the Bell 206 was a safer design, he did not
explain why the aluminum is a safer design, provide any details concerning the
crash of the Bell 206 to explain why the doors remained on that helicopter, or
give any reason the doors of the Bell 407 would have remained on the helicopter
had its sides been constructed of aluminum.  Therefore, Ross=s
testimony is conclusory and no evidence that the door mounts on the Bell 407
were defectively designed or that there was an available safer alternative
design.  See Coastal Transp. Co., 136 S.W.3d at 231B33
(holding expert=s testimony was too
conclusory to support a judgment).








Appellants incorrectly contend that Bell
waived its complaint concerning the sufficiency of Ross=s
testimony.  A[W]hen a reliability challenge requires
the court to evaluate the underlying methodology, technique, or foundational
data used by the expert, an objection must be timely made so that the trial
court has the opportunity to conduct this analysis.@  Id.
at 233.  AHowever, when the challenge is
restricted to the face of the record, for example, when expert testimony is
speculative or conclusory on its face, then a party may challenge the legal
sufficiency of the evidence even in the absence of any objection to its
admissibility.@  Id.  Here, Bell=s
challenge does not concern Ross=s methodology, technique, or
foundational data.  Instead, Bell argues that Ross=s
testimony is conclusory and speculative on its face.  No objection was required
to preserve the no evidence issue for appellate review.  See id.  We
sustain Bell=s fifth issue.

E.  Helicopter Restraint System

Bell argues in its fourth issue that the
trial court erred by submitting the design defect claim concerning the
helicopter restraint system to the jury because there is no evidence that
Appellants= proposed alternative restraint system
was available for use on civil helicopters or that the proposed alternative
restraint system would have prevented or significantly reduced Gloria=s
injuries. 

1.  Commercial Availability

Bell contends that Appellants did not
meet their burden of proving that the MA-16, Appellants=
proposed safer alternative design, and its underlying technology were available
for use at the time the Bell 407 was manufactured in 1997 because Appellants=
seatbelt expert, William Muzzy, Aundertook
no analysis of whether the design could have passed the rigorous FAA testing
and certification procedure[] so that it could have actually been installed on
the aircraft.@  Bell also argues that Appellants Amade
no showing that the MA-16 or its underlying technology would be approved for
use by the State Department@ under the International
Trafficking in Arms Regulations (ITAR).  However, Bell cites no authority to
support its contentions, and we find none.  

Contrary to Bell=s
assertion, section 82.005(b) does not require proof that the proposed safer
alternative design would have gained regulatory approval.  See Tex. Civ.
Prac. & Rem. Code Ann. ' 82.005(b).  Instead,
section 82.005(b) requires proof that the safer alternative design Awas
economically and technologically feasible at the time the product left the
control of the manufacturer or seller by the application of existing or
reasonably achievable scientific knowledge.@  Id. 
To adopt Bell=s contention that a claimant must prove
that the proposed alternative design would have been approved by the relevant
regulatory agencies would be tantamount to adding an additional element to a
claimant=s
design defect cause of action, and we decline to do so.  See Petco Animal
Supplies, Inc. v. Schuster, 144 S.W.3d 554, 565 (Tex. App.CAustin
2004, no pet.) (AAs an intermediate appellate
court, we are not free to mold Texas law as we see fit but must instead follow
the precedents of the Texas Supreme Court unless and until the high court
overrules them or the Texas Legislature supersedes them by statute.@). 
We therefore overrule this portion of Bell=s
fourth issue.

2.  Prevent or Significantly Reduce Risk
of Injury

Bell also argues that there is no
evidence that the MA-16 was a safer alternative design because Muzzy never
explained how the MA-16 would have prevented or significantly reduced the risk
of Gloria=s injuries.  

Muzzy testified that the MA-16 was a
safer alternative design to the restraint system in the Bell 407 because the MA-16
has an omni-directional  sensing retractor and the Bell 407=s
movements after impact were omni-directional.  Muzzy explained that the MA-16
is a Adual-sensing
omnidirectional retractor@ that incorporates both
vehicle sensing and web sensing technology and that the Bell 407 restraint
system had only web sensing technology.  He testified that web sensing locks
the seatbelt when the seatbelt is pulled forward rapidly but that the seatbelt
will unlock when the tension on the seatbelt is released.  In contrast, vehicle
sensing locks the seatbelt when the helicopter is accelerated in any
direction.  Muzzy testified that the MA-16 would have prevented Gloria from
moving outside the helicopter because it has omni-directional dual sensing.  

Using the animation of the crash
sequence, Muzzy demonstrated each of the times that Gloria=s
restraint would have locked and then unlocked.  Muzzy testified that even
though Gloria had her seatbelt on, she was partially ejected from the
helicopter during the crash sequence because the locking and unlocking in the
restraint system allowed the seatbelt to continually extend to the point where
it did not restrain her in her seat or even inside the helicopter.  He
testified that the restraint system worked as it was designed but that it
should have been designed so that it would not lock and unlock. 








Again using the animation of the crash
sequence, Muzzy testified that the helicopter=s
movements during the crash sequence were omni-directional because A[y]ou
have a force down, you have forces laterally and you have deceleration forces
forward.  So you have them in all three directions.@  He
averred that Athe lack of an omni-directional vehicle
sensing retractor . . . in the aircraft was the proximate
cause of [Gloria] being ejected and [her] subsequent death.@ 
Muzzy=s
testimony is not conclusory and presented more than a scintilla of evidence
that the proposed safer alternative design would have prevented or
significantly reduced the risk of Gloria=s
death.  See Burry, 203 S.W.3d at 535B36
(holding that expert Asufficiently explained the
basis for his testimony@ and that there was more
than a scintilla of evidence of a safer alternative design).  We therefore
overrule the remainder of Bell=s fourth issue.

VII. 
Comparative Responsibility

Appellants contend in their fifth issue
that the evidence is legally and factually insufficient to support the jury=s
finding that Captain Damian=s comparative negligence
caused fifty percent of the Appellants=
injuries. 

A.   Standards
of Review

We may sustain a legal sufficiency
challenge only when (1) the record discloses a complete absence of evidence of
a vital fact; (2) the court is barred by rules of law or of evidence from
giving weight to the only evidence offered to prove a vital fact; (3) the evidence
offered to prove a vital fact is no more than a mere scintilla; or (4) the
evidence establishes conclusively the opposite of a vital fact.  Uniroyal
Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert.
denied, 526 U.S. 1040 (1999); Robert W. Calvert, "No Evidence"
and "Insufficient Evidence" Points of Error, 38 Tex. L. Rev. 361,
362B63
(1960).  Anything more than a scintilla of evidence is legally sufficient to
support the finding.  Cont=l
Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex.
1996); Leitch v. Hornsby, 935 S.W.2d 114, 118 (Tex. 1996).  When the
evidence offered to prove a vital fact is so weak as to do no more than create
a mere surmise or suspicion of its existence, the evidence is no more than a
scintilla and, in legal effect, is no evidence.  Kindred v. Con/Chem, Inc.,
650 S.W.2d 61, 63 (Tex. 1983).  More than a scintilla of evidence exists if the
evidence furnishes some reasonable basis for differing conclusions by
reasonable minds about the existence of a vital fact.  Rocor Int=l,
Inc. v. Nat=l Union Fire Ins. Co., 77
S.W.3d 253, 262 (Tex. 2002).  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable factfinder could and
disregard evidence contrary to the finding unless a reasonable factfinder could
not.  Cent. Ready Mix Concrete Co. v. Islas, 228 S.W.3d 649, 651 (Tex.
2007); City of Keller, 168 S.W.3d at 807, 827.








When reviewing an assertion that the
evidence is factually insufficient to support a finding, we set aside the
finding only if, after considering and weighing all of the evidence in the
record pertinent to that finding, we determine that the evidence supporting the
finding is so weak, or so contrary to the overwhelming weight of all the
evidence, that the answer should be set aside and a new trial ordered.  Pool
v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh=g); Garza
v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965); In re King=s
Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).  Factual
sufficiency issues depend on who has the burden of proof at trial.  See
Gooch v. Am. Sling Co., 902 S.W.2d 181, 184 (Tex. App.CFort
Worth 1995, no writ).  When the party with the burden of proof appeals from a
failure to find, the party must show that the failure to find is against the
great weight and preponderance of the evidence.  Cropper v. Caterpillar
Tractor Co., 754 S.W.2d 646, 651 (Tex. 1988); see Herbert v. Herbert,
754 S.W.2d 141, 144 (Tex. 1988). 

B.  Analysis








Ross, Appellants=
helicopter pilot expert, testified that the helicopter was flying at 120 knots
forward air speed and at 1,500 feet above sea level when Captain Damian made a
five-degree course correction to avoid the flock of birds sighted in the
distance.  Ross said that he had no criticisms of the five-degree course
correction because the pilots acknowledged the birds and made a move to avoid
the pack of birds.  Ross explained that the five-degree course correction would
have moved the helicopter away from the birds at a distance of
three-and-one-half rotor lengths and that he believed this was sufficient
because the helicopter moved past the flock of birds.[28] 
Based on Captain Garay=s testimony, Ross stated
that he believed the helicopter moved past the flock of birds because the bird
did not come from the main pack, that it approached the helicopter from above,
and that it approached quickly, giving the pilots only fractions of a second to
try to avoid it.  Ross averred that Captains Damian and Garay were not
negligent, that they did all they could to save the helicopter and its
passengers, and that they did not proximately cause the accident.  

Ross admitted on cross-examination,
however, that Captain Garay=s written statement to
Panamanian investigators twenty days after the accident mentioned only a single
bird and did not mention a flock of birds.[29] 
Ross also acknowledged that a pilot wants to do all he can to avoid a mid-air
collision with a bird, especially a bird the size of the one that struck the
helicopter.  He testified that seeing birds ahead would alert him to think of a
potential mid-air collision and that he would act to avoid a collision.  Ross
agreed that the pilots could have turned the helicopter sharply or hovered after
seeing the birds thirty to sixty seconds away at 120 knots.  He also agreed
that Captain Damian could have turned the helicopter thirty or forty-five
degrees and significantly increased the helicopter=s
distance from the birds, that two ninety-degree turns would have added less
than one minute to the overall flight time, and that there was no reason
Captain Damian could not have made two ninety-degree turns.  Ross also
acknowledged that a vulture can fly up to 900 feet in thirty seconds and that a
five-degree course correction would not alter the helicopter=s
course 900 feet.  In addition, Ross agreed that a pilot does not know what a
bird will do, so the pilot should err on the side of caution in attempting to
avoid a collision.  Moreover, in response to a hypothetical question, Ross
testified that he would place some fault on the pilots if they saw a
hang-glider thirty to sixty seconds away but failed to avoid the hang-glider
after making only a five-degree course correction.  Finally, Ross agreed that a
more aggressive evasive action by the pilots in this case would have avoided
the mid-air collision. 

The jury also heard testimony from
Warren Wandel, Bell=s pilot expert, concerning
comparative negligence by Captain Damian.  Wandel testified that ninety percent
of bird strikes occur below 2000 feet, that eighty-three percent of bird
strikes occur below 1500 feet, that flying closer to the ground increases the
chances of a bird strike, and that an important avoidance technique is to fly
the aircraft Aat the highest altitude you can.@ 
Wandel also listed other considerations for avoiding bird strikes, including
charting flight plans to avoid known bird concentration areas and reducing
speed when operating in areas of bird activity. He also testified that, even assuming
there was a single bird flying away from the flock of birds, Captain Damian
should have made a more drastic course correction after seeing the flock of
birds and that doing so would have avoided the accident.  We conclude that the
evidence is legally and factually sufficient to support the jury=s
finding that Captain Damian was negligent.  See Cent. Ready Mix
Concrete Co., 228 S.W.3d at 651; City of Keller, 168 S.W.3d at 807,
827; Pool, 715 S.W.2d at 635; Garza, 395 S.W.2d at 823; King=s
Estate, 244 S.W.2d at 661.

Concerning the jury=s
apportionment of fifty percent responsibility to Captain Damian, the Ajury
is given wide latitude in performing its sworn duty to serve as factfinder in
allocating responsibility for an accident pursuant to section 33.003 of the
civil practice and remedies code.@  Rosell
v. Cent. W. Motor Stages, Inc., 89 S.W.3d 643, 659 (Tex. App.––Dallas 2002,
pet. denied).  In Rosell, despite conflicting evidence, the court
affirmed the factual sufficiency of the evidence supporting the jury=s
apportionment of seventy percent responsibility to the claimant for causing his
own injuries when he stopped to help an injured motorist on the side of the
road, moved into the lane of an approaching bus, was warned of the bus, but did
not take evasive action.  Id.  Similarly, in Hagins v. E-Z Mart
Stores, Inc., a case involving a fatal fall by a construction worker, the
court affirmed the jury=s apportionment of sixty
percent responsibility to the decedent because the evidence demonstrated that
it was unsafe to use a platform while positioned at an angle, that the decedent
decided not to attempt to place the platform flush against the wall, and that
the decedent knew the hazards of working above the ground without a safety
harness.  See 128 S.W.3d 383, 392 (Tex. App.––Texarkana 2004, no pet.). 
Given the conflicting evidence presented to the jury, including but not limited
to the testimony that the accident would not have occurred had Captain Damian
taken more aggressive evasive action, we conclude that the evidence is legally
and factually sufficient to support the jury=s
apportionment of fifty percent responsibility to Captain Damian.  A[I]t
is not the place of this Court to substitute its judgment for that of the jury,
even if a different percentage of allocation could be supported by the
evidence.@  Id. (citing Rosell, 89
S.W.3d at 659B60).








Based on the foregoing, and after
reviewing all of the evidence in the light favorable to the jury=s
findings, crediting favorable evidence if a reasonable factfinder could, and
disregarding contrary evidence unless a reasonable factfinder could not, we
hold that there is legally sufficient evidence to support the jury=s
findings that Captain Damian was comparatively negligent and that his
negligence caused fifty percent of Appellants=
injuries.  See Cent. Ready Mix Concrete Co., 228 S.W.3d at 651; City
of Keller, 168 S.W.3d at 807, 827.  Likewise, after considering and
weighing all of the evidence pertinent to the jury=s
findings, we cannot say that the evidence supporting the jury=s
findings is so weak or contrary to the overwhelming weight of all the evidence
that it should be set aside and a new trial ordered.  See Pool, 715
S.W.2d at 635; Garza, 395 S.W.2d at 823; King=s
Estate, 244 S.W.2d at 661.  We therefore overrule Appellants=
fifth issue.

VIII. 
Mental Anguish Damages

Appellants contend in their fourth issue
that the trial court erred by failing to order a new trial because the damages
awarded by the jury are Aso against the great weight
and preponderance of the evidence as to be manifestly unjust.@
Because of our disposition of Bell=s
second, fourth, and fifth issues, we address only the jury=s
award of $50,000 in mental anguish damages to Gloria=s
estate.  See Tex. R. App. P. 47.1. 








Appellate briefs must contain
appropriate citations to the record.  See Tex. R. App. P. 38.1(i).  And
bare assertions of error without proper citation to the record waive error.  See
Fredonia State Bank v. Gen. Am. Life Ins. Co., 881 S.W.2d 279, 284 (Tex.
1994) (appellate court has discretion to waive point of error due to inadequate
briefing); Devine v. Dallas Cnty., 130 S.W.3d 512, 513–14 (Tex. App.––Dallas
2004, no pet.) (holding that when a party fails to adequately brief a
complaint, he waives the issue on appeal).  Although Appellants devote eight
pages of their brief to their contention that the jury=s
damage awards are against the great weight and preponderance of the evidence,
Appellants= brief does not cite any portion of the
record to support their assertion that the $50,000 in mental anguish damages
awarded to Gloria=s estate are so against the
great weight and preponderance of the evidence to be manifestly unjust.  And
although Appellants included the damages awarded to Gloria=s
estate in the recitation of their fourth issue, the remainder of Appellants=
briefing concerning damages never again mentions the $50,000 awarded to Gloria=s
estate for mental anguish.  Because Appellants=
assertion that the damages awarded to Gloria=s
estate are against the great weight and preponderance of the evidence is not
supported by record references or citation to legal authority, they have failed
to preserve this issue for appellate review.  See Tex. R. App. P.
38.1(i); Fredonia State Bank, 881 S.W.2d at 284; Devine, 130
S.W.3d at 513–14. We overrule Appellants=
fourth issue.  

IX. 
Alleged Jury Misconduct

Appellants contend in their first two
issues that the trial court erred by failing to accept juror affidavits for
filing, failing to conduct an open hearing concerning allegations that the jury
traded-off answers on the jury charge, and failing to grant a new trial due to
alleged jury misconduct.  Appellants argue in their third issue that if Texas
law prohibits inquiry into the alleged jury misconduct in this case, then the
prohibition violates the open-courts provision of the Texas constitution and
the Fifth and Fourteenth Amendments to the United States Constitution.  Bell
responds that we should overrule Appellants=
first three issues because rule of civil procedure 327(b) and rule of evidence
606(b) prohibit juror testimony concerning any matter or statement occurring
during deliberations other than matters related to outside influence.  See
Tex. R. Civ. P. 327(b); Tex. R. Evid. 606(b). 

A.  Traded Answers

Rule of civil procedure 327(b) states:








A juror may not
testify as to any matter or statement occurring during the course of the jury=s deliberations or to
the effect of anything upon his or any other juror=s mind or emotions as
influencing him to assent to or dissent from the verdict concerning his mental
processes in connection therewith, except that a juror may testify whether any
outside influence was improperly brought to bear upon any juror.  Nor may his
affidavit or evidence of any statement by him concerning a matter about which
he would be precluded from testifying be received for these purposes.

 

Tex. R. Civ. P. 327(b).  Rule of evidence 606(b) sets
forth a virtually identical prohibition against jury testimony concerning any
matter other than outside influence.  Tex. R. Evid. 606(b).

Appellants argue that the trial court
should have accepted the juror affidavits and conducted an open hearing to
receive juror testimony because the jury=s
alleged Atrading-off@ of
answers was an overt act of the jurors and did not involve any juror=s
mental processes.  Appellants also contend that an overt act is governed by
rule 327(a), which permits evidence of jury misconduct, rather than rule
327(b), which prohibits juror testimony concerning deliberations. Compare
Tex. R. Civ. P. 327(a), with Tex. R. Civ. P. 327(b).  In Golden Eagle
Archery, Inc. v. Jackson, the supreme court stated:

Most Texas courts
considering the question have held that the rules prevent a juror from
testifying that the jury discussed improper matters during deliberation.  We
agree.  The rules contemplate that an Aoutside influence@ originates from
sources other than the jurors themselves.  Accordingly, here the accounts that
some jurors speculated whether alcohol was involved in the accident and that
Jackson may have received a settlement, or that the jurors traded answers on
two issues, are all juror statements about matters occurring during their
deliberations.  They are not evidence of outside influences.

 

24 S.W.3d 362, 370 (Tex. 2000) (internal citations omitted)
(emphasis added). 

Applying Golden Eagle Archery to
this case, juror testimony that they traded answers is not evidence of an
outside influence.  See id.  Thus, civil procedure rule 327(b) and rule
of evidence 606(b) prohibited the trial court from receiving juror affidavits
or other juror testimony concerning alleged traded answers.  See Tex. R.
Civ. P. 327(b); Tex. R. Evid. 606(b); Golden Eagle Archery, 24 S.W.3d at
370; see also Ford Motor Co. v. Castillo, 279 S.W.3d 656, 666 (Tex.
2009) (A[D]iscovery
involving jurors should ordinarily be limited to facts and evidence relevant to
(1) whether any outside influence was improperly brought to bear upon any
juror, and (2) rebuttal of a claim that a juror was not qualified to serve.@).

Appellants cite several cases for the
proposition that Athe trading of answers and
the cluster answering are of such severity and obvious harm that a new trial
must be granted.@[30] 
However, each case cited by Appellants was decided before the effective dates
of the current rule of procedure 327(b) and rule of evidence 606(b).  See
Robinson Elec. Supply Co. v. Cadillac Cable Corp., 706 S.W.2d 130, 131B32
(Tex. App.––Houston [14th Dist.] 1986, writ ref=d
n.r.e.), overruled on other grounds by, Golden Eagle Archery, 24
S.W.3d at 369 & n.3 (noting effective date of rules and stating, AUnder
former Rule 327(b), effective until April 1, 1984, a juror was permitted to
testify as to matters and statements, or >overt
acts=,
which occurred during deliberations.@). 
Therefore, we are bound by the language of rules 327(b) and 606(b) that
prohibits juror testimony concerning any matter other than outside influence
and the supreme court=s holding in Golden Eagle
Archery that alleged trading answers by the jury is not an outside
influence.  See Tex. R. Civ. P. 327(b); Tex. R. Evid. 606(b); Golden
Eagle Archery, 24 S.W.3d at 370.  And we decline to adopt a rule, as
suggested by Appellants, that inquiry into jury deliberations is permissible if
there is prima facie evidence of jury misconduct during deliberations other
than an outside influence.  We overrule Appellants=
first and second issues.

B.  Constitutional Arguments

Appellants contend in their third issue
that the prohibition against juror testimony concerning the Atrading-off@ of
answers violates their rights to due process and equal protection under the
United States Constitution and to due process, a jury trial, and open courts
under the Texas constitution.  See U. S. Const. amends. V, XIV, ' 1;
Tex. Const. art. I, '' 13, 15, 19. 








In Golden Eagle Archery, the
appellant argued that rule 327(b) Aconflicts
with the guarantees of the right to a fair and impartial jury trial@ in
article I, sections 10 and 15 of the Texas constitution.  24 S.W.3d at 374. 
Rejecting the argument, the court discussed with approval two cases from the
Corpus Christi court of appeals that collectively held that rules 327(b) and
606(b) do not violate due process under the Fourteenth Amendment or the Texas
constitution, the right to a fair and impartial jury under the Texas
constitution, or the open courts provision of the Texas constitution.  Id.;
see Soliz v. Saenz, 779 S.W.2d 929, 934–35 (Tex. App.––Corpus Christi
1989, writ denied); King v. Bauer, 767 S.W.2d 197, 199 (Tex. App.––Corpus
Christi 1989, writ denied).  We follow Golden Eagle, Soliz, and King
and hold that rules 327(b) and 606(b) do not violate Appellants=
rights under the United States Constitution or the Texas constitution.[31] 
We overrule Appellants= third issue.

X. 
Conclusion

Because we have overruled each of
Appellants= six issues, sustainedpart of Bell=s
second issue and all of its fifth issue, and overruled the remainder of Bell=s
issues, we affirm the portion of the trial court=s
judgment relating to the claims on behalf of Gloria Gasperi=s
estate.  We reverse the remainder of the trial court=s
judgment, and we render judgment that Appellants Lourdes Maria Vargas de
Damian, individually, as next friend to Nicole Denisse Damian Vargas, and as
representative of the estate of Demetrio Damian Chen, deceased; Ricardo Adolfo
Garay Barrios; Lorenzo Romagosa Acrich; and Ida Romagosa de Aranjo take
nothing.

 

ANNE
GARDNER

JUSTICE

 

PANEL:  DAUPHINOT,
GARDNER, and WALKER, JJ.

 

WALKER, J. filed a
concurring and dissenting opinion.

 

DELIVERED:  August 31,
2011 

 

 


 
 
 
 
 
 


 

 




 


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
  
 
 


 

NO. 02-08-00210-CV 

 

 


 
 
 Lourdes Maria Vargas de Damian, Individually, As
 Next Friend to Nicole Denisse Damian Vargas, and as Representative of the
 Estate of Demetrio Damian Chen, Deceased; GUILLERMO JOSE GASPERI, INDIVIDUALLY
 AND AS REPRESENTATIVE OF THE ESTATE OF GLORIA GASPERI, DECEASED; CARLA
 GASPERI, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF GLORIA GASPERI,
 DECEASED; Angela cecilia lassen de gasperi, as legal and personal
 representative of the estate of gloria gasperi; ricardo adolfo garay barrios;
 lorenzo romagosa acrich; and ida romagosa de aranjo
 
 
  
 
 
 APPELLANTS 
 AND APPELLEES
 
 
 
 
  
 V.
  
 
 
 
 
 Bell Helicopter Textron, Inc.
 
 
  
 
 
 APPELLEE 
 AND APPELLANT 
 
 


 

 

----------

 

FROM THE 352nd
District Court OF Tarrant COUNTY

----------

 

CONCURRING
AND DISSENTING OPINION

----------

 

I.  Introduction

          In its second issue, Appellee Bell Helicopter
Textron, Inc. argues that the trial court erred by submitting question 6, the
design defect question, to the jury.  Specifically, Bell claims, and the
Majority Opinion holds, that Bill Hinds’s testimony is the only evidence in the
record that a safer alternative windshield design was feasible in 1997 when the
Bell 407 helicopter at issue was manufactured.  I cannot agree that Hinds’s
testimony is the only evidence supporting the feasibility of the safer
alternative design element of the windshield design defect claim asserted
against Bell by Appellants.  Even excluding Hinds’s testimony, the remainder of
the testimony and the evidence in the fifty-nine volumes of the reporter’s
record contains more than a scintilla of evidence that a safer alternative
design—either a 0.14-inch stretched acrylic windshield or a 0.10-inch
monolithic polycarbonate windshield—was technologically and economically feasible
in 1997, that the safer alternative design would have significantly reduced the
risk that the black vulture would have penetrated the helicopter’s windshield
intact and killed Captain Damian, and that use of the safer alternative design
windshield would not have substantially impaired the Bell 407’s utility.[32] 
Accordingly, I dissent.  I concur with the remainder of the Majority’s Opinion.

II. 
Even Disregarding
Hinds’s Testimony,
Legally Sufficient
Evidence Exists
to Support
Submission of Question
6 to the Jury

 

A.  Standard of
Review

 

We may sustain a legal sufficiency
challenge only when (1) the record discloses a complete absence of evidence of
a vital fact, (2) the court is barred by rules of law or of evidence from
giving weight to the only evidence offered to prove a vital fact, (3) the
evidence offered to prove a vital fact is no more than a mere scintilla, or (4)
the evidence establishes conclusively the opposite of a vital fact.  Uniroyal
Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert.
denied, 526 U.S. 1040 (1999); Robert W. Calvert, “No Evidence” and “Insufficient
Evidence” Points of Error, 38 Tex. L. Rev. 361, 362–63 (1960).  In
determining whether there is legally sufficient evidence to support the finding
under review, we must consider evidence favorable to the finding if a
reasonable factfinder could and disregard evidence contrary to the finding
unless a reasonable factfinder could not.  Cent. Ready Mix Concrete Co. v.
Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson,
168 S.W.3d 802, 807, 827 (Tex. 2005).

B.  The
Court’s Charge

Question number 6 submitted the
following question to the jury:

QUESTION NO. 6:

          Was there a
design defect in the helicopter at the time it left the possession of Bell
Helicopter Textron, Inc. that was a producing cause of the injuries in
question?

          A “design
defect” is a condition of the product that renders it unreasonably dangerous as
designed, taking into consideration the utility of the product and the risk
involved in its use.  For a design defect to exist there must have been a safer
alternative design.

          “Safer
alternative design” means a product design other than the one actually used
that in reasonable probability––

          1.  would
have prevented or significantly reduced the risk of the occurrence in question
without substantially impairing the product’s utility and 

          2.  was
economically and technologically feasible at the time the product left the
control of Bell Helicopter Textron, Inc. by the application of existing or
reasonably achievable scientific knowledge.   

 

Answer “Yes” or “No.”

 

Answer:  [the jury
answered, “yes”]

 

C.  Other
Testimony and Evidence in the Record

          The crash at issue occurred when a 3.5- to
4-pound black vulture hit the 0.10-inch as-cast acrylic windshield of a Bell
407 helicopter being flown by Captain Damian.  All experts agreed that the
maximum speed that the Bell 407 could have been traveling at the time of the
bird strike was 120 knots.  The bird penetrated the helicopter’s windshield,
making a hole in it, and entered the cockpit intact. Several pictures of the
bird and the helicopter’s windshield were offered into evidence; they showed
the bird intact and a hole straight through the helicopter’s as-cast acrylic
windshield.  The bird struck Captain Damian in the head and either killed him
or caused him to lose consciousness so that he slumped over the helicopter’s
controls.  

In its second issue, Bell claims that
Hinds’s testimony is the only evidence in the record that a safer alternative
windshield design was technologically and economically feasible in 1997 when
the Bell 407 was manufactured.  Bell claims that neither of Hinds’s proposed
safer alternative designs––a 0.14-inch stretched acrylic windshield or a
0.10-inch monolithic polycarbonate windshield––were technologically feasible
(1) because the stretched acrylic windshield was too heavy to be used in a
light, Part 27 helicopter like the Bell 407; (2) because insertion of a
0.10-inch monolithic polycarbonate windshield into a Bell 407 would require
“hundreds and hundreds” of pounds of structure to be added to support the
polycarbonate windshield; and (3) because a 0.10-inch monolithic polycarbonate
windshield would not stay in the windshield frame in the event of a bird strike
but instead would push through the frame into the cockpit.

As set forth below, even excluding
Hinds’s testimony, more than a scintilla of evidence exists proving each of the
vital facts necessary to support the safer alternative design element of the
windshield design defect claim submitted to the jury in question 6.

1. 
Technological Feasibility

The jury’s finding that a safer
alternative windshield design—a 0.14-inch stretched acrylic bird-impact
resistant windshield or a 0.10-inch monolithic polycarbonate bird-impact
resistant windshield—existed in 1997 when the Bell 407 at issue was
manufactured is supported by the evidence set forth below.  Most importantly,
prior to 1997, Bell itself manufactured bird-impact resistant
windshields for some of its helicopters.[33] 
Bell’s manufacture of bird-impact resistant windshields prior to 1997 is some
evidence that it was technologically feasible for Bell to manufacture a
bird-resistant windshield in 1997 for the Bell 407 by the application of
existing or reasonably achievable scientific knowledge that Bell itself
possessed.  

Although Bell asserted at trial that
polycarbonate windshields were not technologically feasible because they
suffered from clarity and durability issues, Bell developed a coating via a
study it concluded in 1994 that eliminated all of the clarity and durability
issues Bell had encountered with polycarbonate windshields.[34] And
coating a windshield does not add appreciably to the thickness of the
windshield; “[t]he coating is very thin one mil.  It’s within tolerance of the
structural ply, so the coating -- if you coat a polycarbonate ply, it does not
increase the thickness appreciably.”

Although Bell asserted at trial that
neither of the proposed safer alternative windshields—a 0.14-inch stretched
acrylic bird-impact resistant windshield nor a 0.10-inch monolithic
polycarbonate bird-impact resistant windshield—were technologically feasible
because they weighed too much, testimony and evidence was adduced that neither
of the safer alternative design windshields are much heavier than the 0.10-inch
as-cast acrylic windshield that was in the Bell 407.[35]

Although Bell asserted at trial that
installation of the safer alternative design of a 0.10-inch monolithic
polycarbonate bird-impact resistant windshield was not technologically feasible
because it would require the addition of “hundreds and hundreds” of pounds of
structure to the Bell 407 to support the windshield, after the accident at
issue here, Bell in fact did install a 0.10-inch monolithic polycarbonate
bird-impact resistant windshield in a Bell 407.  Absolutely no structural
changes were made to the Bell 407 prior to installing the 0.10-inch monolithic
polycarbonate windshield,[36] and
certainly not the addition of “hundreds and hundreds of pounds of structure.”[37] 

2. 
Economic Feasibility

Several witnesses testified
that both a monolithic polycarbonate windshield and a stretched acrylic
windshield were economically feasible in prior to 1997.[38]  

3.  Either of the
Safer Alternative Design Windshields Would Have     Significantly Reduced the
Risk of the Occurrence in Question

 

Had the Bell 407 been equipped with
either of the safer alternative design bird-impact resistant
windshields––either a 0.10-inch monolithic polycarbonate windshield or a
0.14-inch stretched acrylic windshield, instead of the 0.10-inch  as-cast
acrylic windshield it did possess––in reasonable probability, the vulture would
either have not come through the windshield or would have been liquefied or
broken into pieces so that Captain Damian was not killed.[39]  Polycarbonate
is more bird-impact resistant than as-cast acrylic because it is more flexible
and absorbs more energy.[40] 
Stretched acrylic is more bird-impact resistant than as-cast acrylic because
heating and stretching the acrylic causes the cross-linking molecules to line
up and results in a more impact-resistant material.[41]  A
0.10-inch stretched acrylic windshield would have significantly reduced the
risk of the occurrence in question, and a 0.14-inch stretched acrylic
windshield would have prevented the vulture from penetrating the windshield
intact.[42]

Although Bell asserted at trial that a
0.10-inch monolithic polycarbonate windshield would not have prevented the
occurrence in question because, according to Bell, the windshield would have
pushed through its frame into the cockpit of the helicopter, Bell based this
assertion on non-bird-strike testing that the jury could have found flawed and
disbelieved.[43] 
The non-bird-strike testing that Bell did perform in preparation for this
litigation involved dropping fifty pounds of lead from a crane onto a square
piece of 0.10-inch monolithic polycarbonate mounted in a wooden frame.[44] 
And even Bell’s non-bird-strike testing constituted some evidence that a
0.10-inch monolithic polycarbonate windshield would not have shattered upon
impact with the 3.5- to 4-pound vulture––since it did not shatter upon impact
with fifty pounds of lead traveling at the same or greater velocity as the
vulture and in a more dangerous, downward angle of attack than the vulture.

4.  Use of a Safer
Alternative Design Windshield

Would Not Impair the
Bell 407’s Utility

 

          In 1999, after only two months of work, Bell
produced and installed a 0.10-inch monolithic polycarbonate windshield in a
Bell 407 for a company called Air Logistics.  Although Bell asserted at trial that
to accomplish this feat would require the addition of hundreds and hundreds of
pounds of structure to the Bell 407, altering the utility of the Bell 407 by
changing it from a lightweight Part 27 helicopter into a heavier, less maneuverable
Part 29 helicopter, the evidence conclusively established that, in fact, Bell
made no structural changes to the Bell 407 in order to install the 0.10-inch
monolithic polycarbonate bird-impact resistant windshield.[45] 
Additionally, Bell did not inform Air Logistics of any of the concerns Bell
expressed at trial—that the 0.10-inch monolithic polycarbonate bird-impact
resistant windshield in the Bell 407 would push through into the Bell 407’s
cockpit in the event of a bird strike.[46]

D. 
Application of the No-Evidence Standard of Review

In short, even excluding Hinds’s
testimony, more than a scintilla of evidence exists supporting every fact that
the jury was required to find in question 6 to support the safer alternative
design element of the windshield design defect claim.  Considering all of the
above evidence favorable to the jury’s safer alternative design finding because
a reasonable factfinder could, and disregarding the sometimes contrary and
conflicting evidence propounded by Bell’s long-time employees and experts
because a reasonable factfinder could, more than a scintilla of evidence exists
supporting the jury’s finding that a safer alternative windshield design
existed for the Bell 407 in 1997.  See Cent. Ready Mix Concrete Co.,
228 S.W.3d at 651; City of Keller, 168 S.W.3d at 807.  

The above evidence—that prior to 1997,
Bell did manufacture numerous bird-impact resistant windshields; that in 1994,
Bell developed a coating that solved its problems with polycarbonate
windshields; that in 1976, Bell was able to design and manufacture a
bird-impact resistant windshield for the Bell 222 to meet European bird-strike
standards; that Bell successfully made a 0.10-inch polycarbonate bird-impact
resistant windshield for the Bell 407 in 1999 within two months after it began
its attempts; and that Bell ultimately did not make any structural changes to
the Bell 407 in order to install a 0.10-inch polycarbonate bird-impact
resistant windshield in a Bell 407—constitutes more than a scintilla of
evidence that it was technologically feasible in 1997 for Bell to manufacture a
0.10-inch monolithic polycarbonate bird-impact resistant windshield for the
Bell 407 by the application of existing or reasonably achievable scientific
knowledge.  See Uniroyal Goodrich Tire Co., 977 S.W.2d at 337 (holding
testimony that competitors were already using the safer alternative design and
the fact that the company switched to the safer alternative design one year
after the accident was evidence of its feasibility); Temple EasTex, Inc. v.
Old Orchard Creek Partners, Ltd., 848 S.W.2d 724, 746–48 (Tex. App.—Dallas
1992, writ denied) (holding that evidence of actual use of a safer design by
the defendant or others at the time of manufacture is admissible on the issue
of defective design and is strong evidence of feasibility).  More than a
scintilla of evidence also exists that a polycarbonate windshield could have
been made economically as early as the 1970s; Bell’s own expert testified that
cost was not an issue with a material as inexpensive as polycarbonate.  Because
all of the experts agreed, and even Bell’s testing confirmed, that a 0.10-inch
monolithic polycarbonate windshield or a 0.14-inch stretched acrylic windshield
would have caused the 3.5- to 4-pound black vulture either to bounce or glance
off of the windshield, to merely crack the windshield, or to penetrate the
windshield in a liquefied form or in pieces, all of which would have prevented
the occurrence in question, more than a scintilla of evidence exists that
either of the safer alternative design bird-impact resistant windshields would
have significantly reduced the risk of the occurrence in question.  See Bryant
v. Giacomini, S.p.A., 391 F. Supp. 2d 495, 501 (N.D. Tex. 2005)
(recognizing that defendant’s expert’s admission that alternative design
reduced risk was sufficient to allow jury to reasonably conclude that existence
of safer alternative design was economically and technologically feasible). 
Bell’s subsequent success in manufacturing and installing a polycarbonate
windshield in the Bell 407 without adding any structural weight to the
helicopter is more than a scintilla of evidence that a 0.10-inch monolithic
polycarbonate bird-impact resistant windshield would not, and in fact did not,
jeopardize or diminish the utility of the Bell 407.  See Allen v. W.A.
Virnau & Sons, Inc., 28 S.W.3d 226, 232–33 (Tex. App.—Beaumont 2000,
pet. denied) (holding that “the documentary evidence submitted by appellants
shows the same model tractor with the ROPS [Rollover Protective Structure] and
the seat belt as standard equipment is some evidence, certainly more than a
scintilla, that the combination system did not jeopardize or diminish the
utility of the tractor”).  Because, even excluding Hinds’s testimony the
evidence is legally sufficient to support submission to the jury of the safer
alternative design element of the windshield design defect claim, I would
overrule Bell’s second issue. 

III. 
Conclusion

          I would hold that the evidence is legally
sufficient to support submission to the jury of the safer alternative design
element of the windshield design defect claim in question 6.  Because the
Majority Opinion holds otherwise, I respectfully dissent.  

          I concur with the Majority Opinion’s
disposition of Bell’s other issues and of Appellants’ issues.

 

SUE WALKER
JUSTICE

 

DELIVERED:  August 31, 2011

 









[1]Appellants-Cross
Appellees are Lourdes Maria Vargas de Damian, individually, as next friend to
Nicole Denisse Damian Vargas, and as representative of the estate of Demetrio
Damian Chen, deceased; Guillermo Jose Gasperi, individually and as
representative of the estate of Gloria Gasperi, deceased; Carla Gasperi,
individually and as representative of the estate of Gloria Gasperi, deceased;
Angela Cecilia Lassen de Gasperi, as legal and personal representative of the
estate of Gloria Gasperi; Ricardo Adolfo Garay Barrios; Lorenzo Romagosa
Acrich; and Ida Romagosa de Aranjo.  We refer to Appellants-Cross Appellees
collectively as Appellants. 





[2]We refer to
Appellee-Cross Appellant as Bell.





[3]The parties do
reference Geier v. American Honda Motor Co., 529 U.S. 861, 120 S. Ct.
1913 (2000) and City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S.
624, 93 S. Ct. 1854 (1973), but neither case addresses the issue presented
here.  In Geier, the Supreme Court held that a common law tort action
for negligent failure to equip an automobile with an airbag was preempted
because it conflicted with the applicable federal law.  529 U.S. at 881B82, 120 S. Ct. at
1925B26.  In City of
Burbank, the Supreme Court held that the field of aviation noise control is
preempted but did not address the field of aviation safety.  411 U.S. at 638B40, 93 S. Ct. at 1862B63.





[4]Bell and Appellants
each filed a translated copy of article 1706.  Although the translations differ
slightly, the differences are not material to our analysis. 





[5]Appellants= translation of
article 1706 states:

 

The civil action to
claim indemnification for calumny or slander or to demand civil liability for
the obligations derived from guilt or negligence referred to in Article 1644 of
the Civil Code, prescribes within the term of one (1) year, counted from the
date it came to the knowledge of the offended party.

 

If a
criminal or administrative action is started opportunely for the facts foreseen
in the above paragraph, the prescription of the civil action shall be counted
from the execution of the criminal judgment or the administrative regulation,
as the case may be. 





[6]We review a summary
judgment de novo.  Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,
289 S.W.3d 844, 848 (Tex. 2009).  We consider the evidence presented in the
light most favorable to the nonmovant, crediting evidence favorable to the
nonmovant if reasonable jurors could, disregarding evidence contrary to the
nonmovant unless reasonable jurors could not, indulging every reasonable
inference and resolving any doubts in the nonmovant=s favor.  Id.;
20801, Inc. v. Parker, 249 S.W.3d 392, 399 (Tex. 2008).  A defendant who
conclusively negates at least one essential element of a cause of action is
entitled to summary judgment on that claim.  IHS Cedars Treatment Ctr. of
DeSoto, Tex., Inc. v. Mason, 143 S.W.3d 794, 798 (Tex. 2004); see
Tex. R. Civ. P. 166a(b), (c). 





[7]Guillermo also
alleged in the original petition that he was a legal representative of Gloria=s estate, but neither
Bell nor Appellants address Guillermo=s capacity to represent Gloria=s estate.  Thus, we
do not address whether Guillermo was a legal representative of Gloria=s estate or the
timeliness of any claim Guillermo asserted on behalf of Gloria=s estate.





[8]The jury charge asked
the jury to determine whether the negligence, if any, of Bell, Captain Damian,
Captain Garay, or Gloria caused Gloria=s injuries and the sum of money that Awould have fairly and
reasonably compensated Gloria Gasperi@ for pain and mental anguish.  The jury
charge does not contain a question, definition, or instruction concerning the
capacity of any person to represent Gloria=s estate. 





[9]Bell did object to
the damages question assuming capacity but stated only that the survival claim Ais barred by the
Statute of Limitations, based on the late filing by Angela Lassen as the
representative of the estate of Gloria Gasperi.@  Bell did not object to Carla or
Angela=s capacity to
represent Gloria=s estate. 





[10]In fact, although
Bell submitted proposed questions, definitions, and instructions to the trial
court, Bell=s proposed questions,
definitions, and instructions did not include any proposed questions,
definitions, or instructions concerning the capacity of a representative of
Gloria=s estate. 





[11]Lorentz conceded in
the court of appeals that she was not an heir of the estate.  See Lorentz v.
Dunn, 112 S.W.3d 176, 179 (Tex. App.CFort Worth 2003, pet. granted), rev=d, 171 S.W.3d 845
(Tex. 2005) (AAppellant further
concedes that she did not qualify as an heir to the estate.@).  





[12]In this regard, we
note that although Bell had the obligation to secure a jury finding on its
limitations defense, Bell did not submit a proposed jury question inquiring
whether a representative of Gloria=s estate sought appointment as administrator
within a reasonable time.  See Woods v. William M. Mercer, Inc., 769
S.W.2d 515, 517 (Tex. 1988) (AThe statute of limitations is an affirmative defense[,
and t]he defendant thus bears the initial burden to plead, prove, and secure
findings to sustain its plea of limitations.@) (citing Tex. R. Civ. P. 94 and Metal
Structures Corp. v. Plains Textiles, Inc., 470 S.W.2d 93, 99 (Tex. Civ.
App.CAmarillo 1971, writ
ref=d n.r.e.).  Thus, to
the extent Bell contends that the survival claim is barred by the statute of
limitations because an estate representative was not appointed administrator
within a reasonable time, we overrule that portion of Bell=s third issue because
Bell did not preserve the argument for appellate review.  See Tex. R.
Civ. P. 278 (AFailure to submit a
question shall not be deemed a ground for reversal of the judgment, unless its
submission, in substantially correct wording, has been requested in writing and
tendered by the party complaining of the judgment.@); Tex. R. App. P.
33.1(a).  Because the issue has not been preserved, we express no opinion as to
whether an estate representative must acquire capacity to represent the estate
within a reasonable time.





[13]As discussed above,
Bell failed to preserve the issue of whether Carla in fact had capacity to
represent Gloria=s estate by failing
to object to the jury charge question assuming capacity. 





[14]Bell also cites this
court=s opinion in McAdams
v. Capitol Products Corp., 810 S.W.2d 290 (Tex. App.––Fort Worth 1991, writ
denied) (op. on reh=g) for the
proposition that the survival claims are time-barred because Carla=s acquisition of
capacity did not relate back to her pre-limitations lack of capacity.  McAdams
was decided before Lorentz and Lovato and reached a contrary
result.  See id. at 293.  And in Lorentz, the supreme court
reversed this court=s opinion that relied
on McAdams as authority.  See Lorentz, 171 S.W.3d at 854–56; Lorentz,
112 S.W.3d at 179.  Because we are unable to distinguish McAdams from Lorentz
and Lovato, we believe McAdams was implicitly overruled by Lorentz
and Lovato. Compare Lorentz, 171 S.W.3d at 854–56, and Lovato,
171 S.W.3d at 846–47, 852–53 with McAdams, 810 S.W.2d at 291,
293.





[15]The trial court
submitted a single, broad-form design defect question to the jury without
differentiating between design defects in the helicopter=s windshield, door
mounts, or restraint system. 





[16]The Robinson
factors are (1) the extent to which the theory has been or can be tested, (2)
the extent to which the technique relies upon the subjective interpretation of
the expert, (3) whether the theory has been subjected to peer review or
publication, (4) the technique=s potential rate of error, (5) whether the underlying
theory or technique has been generally accepted as valid by the relevant
scientific community, and (6) the non‑judicial uses which have been made
of the theory or technique.  923 S.W.2d at 557.





[17]Hinds acknowledged
that he had only twelve weeks of training in structural design of aircraft and
no training or experience in helicopter structural design. 





[18]Other evidence
estimated there are 1,000 Bell 407’s in use in the United States. 





[19]The Bell 430 is a
medium-weight helicopter with a maximum gross-weight of 8,400 pounds compared
to the maximum gross-weight of 5,500 pounds for the Bell 407.  The Bell 430 is
bird resistant, and Allman testified that Bell did not design the Bell 407 to
be bird resistant because doing so A[t]urns [it] into a 430,@ that Bell is Ataking a light helicopter
and making it smoother and faster, better for the performance,@ and that Bell is Anot designing another
bird-strike 430.@  See Brockert v.
Wyeth Pharm., Inc., 287 S.W.3d 760, 770 (Tex. App.––Houston [14th Dist.]
2009, no pet.) (AThe Texas Supreme Court
has held that a plaintiff cannot prove design defect by claiming that [a]
defendant should have sold an entirely different product.@) (citing Caterpillar,
Inc. v. Shears, 911 S.W.2d 379, 384B85 (Tex. 1995)).





[20]Hinds further opined
that he thinks the entire industry knew that birds were a serious problem and
that the manufacturers of helicopters as well as the government were negligent
in ignoring the danger of bird strikes, but he has published no papers on the
subject nor encouraged the FAA or the industry to accept his opinions. 





[21]Hinds testified that
he has tested eighth-inch polycarbonate windshields, but he admitted they are
twenty-five percent thicker, are not monolithic, and are actually much thicker
than an eighth-inch considering the other layers. 





[22]The Sanchez
court stated, A[T]he plaintiffs did
not have to build and test an automobile transmission to prove a safer
alternative design.  A design need only prove >capable of being developed.=@  Id. at 592. 





[23]Relying on Sanchez
and other similar opinions, the dissent asserts that our holding that Hinds=s testimony is
conclusory and speculative is Apremised on the erroneous premise that Hinds was required
to build and to test a prototype windshield.@  Dissent at 3 n.1.  To the contrary, we
merely hold that Hinds, as an expert witness, was required to explain his
conclusions and link them to the facts of the case or the analysis he conducted
to support his opinion.  We reference the many other deficiencies in Hinds=s testimony only to
illuminate the conclusory and speculative nature of his testimony that a 0.1
inch polycarbonate or 0.14 inch stretched acrylic windshield could be
successfully mated to a Bell 407Cand make it resistant to a 3.5 to four pound
bird traveling at 120 knotsCby adding 1.5 inches to the mating structure around the
windshield.





[24]The Norman
court stated, 

 

While the use of an
alternative design by another manufacturer may establish technological
feasibility, . . . as a matter of law, it does not establish economic
feasibility. . . .  Evidence of use in the marketplace alone is not sufficient
to establish economic feasibility under Texas law.  To establish economic
feasibility, the plaintiff must introduce proof of the cost of incorporating
this technology.

 

Id. (internal citations
omitted). 





[25]Similarly, and as the
dissent points out, Bell built two helicopters about the size of the Bell 407
for the militaryCwith either
polycarbonate or stretched acrylic windshieldsCin 1997 or 1998.  See Dissent,
at 8–9 n.3.  However, there is no evidence of whether the military helicopters
were capable of resisting a 3.5 to four pound bird like the one involved in
this case or whether they were resistant to only a 2.2 pound bird (like all of
the other bird-resistant helicopters discussed at trial).  Further, there is no
evidence of the thickness of the military helicopter windshields or of their
design (such as monolithic or multi-layer) to determine whether they are at all
comparable to the alternative designs proposed by the Appellants in this case. 





[26]The dissent points to
the Bell 222, the Bell 609, and the Bell UH-1 as evidence of a safer
alternative design, but none of these helicopters is remotely comparable to the
Bell 407.  See Dissent, at 8–9 n.3.  The Bell 222 is a 10,000 to
13,000-pound Part 29 helicopter, with a windshield that is Ashaped entirely
different than the 407,” that is installed with bolts rather than adhesive, and
that was only resistant to a 2.2 pound bird rather than a bird in excess of 3.5
pounds.  Allan Allman testified that comparing the Bell 430 (the current
version of the Bell 222) to the Bell 407 is like Acomparing a grape to an orange.@  

 

The
Bell 609 is a tilt-rotor aircraftCboth an airplane and a helicopterCsimilar to the V-22
Osprey.  Its windshield is multi-ply and 0.75 inches thick, including at least
one outer ply of 0.1 inch glass and two layers of 0.25 inch polycarbonate, and
it is more than seven times the thickness of the 0.1 inch polycarbonate design
proposed by the Appellants.  Similarly, the UH-1 is three times larger than the
407, its structure is Amade totally
different@ than the 407, and
its polycarbonate windshield is 0.25 inches, two and one-half times the
thickness of the polycarbonate design proposed by the Appellants. 

 

Allman testified that these large helicopters are Ain a different
category@ and that looking at
them as alternative designs Awould be something like taking the front end off your 250
Ford truck and put[ting] it on a Honda Civic.@  As discussed above, the Appellants
cannot successfully prove the existence of a safer alternative design by
offering evidence that Bell should have built an entirely different product.  See
Brockert, 287 S.W.3d at 770 (citing Shears, 911 S.W.2d at 384B85).





[27]We need not address,
and express no opinion concerning, the remainder of Bell=s second issue.  See
Tex. R. App. P. 47.1.





[28]The jury heard
conflicting testimony about the single bird separated from the flock of birds. 
For example, Captain Garay acknowledged that he never mentioned the flock of
birds in his written statement to Panamanian authorities, and Lorenzo testified
that he heard the pilots refer to the flock of birds but admitted that he did
not mention the flock of birds during his deposition testimony. 





[29]Ross also agreed that
a hypothetical animation based on Captain Garay=s written statement would look nothing
like the animation that Ross prepared to explain his opinions to the jury. 





[30]See generally Strange
v. Treasure City,
608 S.W.2d 604 (Tex. 1980); Monkey Grip Rubber Co. v. Walton, 122 Tex.
185, 53 S.W.2d 770 (Tex. 1932); Landreth v. Reed, 570 S.W.2d 486 (Tex.
Civ. App.––Texarkana 1978, no writ); Crawford v. Consol. Underwriters,
323 S.W.2d 657 (Tex. Civ. App.––Beaumont 1959, writ ref=d n.r.e.).





[31]To the extent
Appellants contend rules 327(b) and 606(b) violate the equal protection clause
of the Fourteenth Amendment, we overrule that portion of Appellants= third point as
inadequately briefed.  See Tex. R. App. P. 38.1(i) (requiring brief to
contain a clear and concise argument for the contentions made with appropriate
citations to authorities).





[32]I also disagree with
the Majority Opinion’s holdings that Hinds was not qualified to testify
concerning a safer alternative windshield design and that his opinions were
speculative and conclusory or not based on sound engineering principles.  All
of these holdings by the majority are premised on the erroneous premise that
Hinds was required to build and to test a prototype windshield.  But no
requirement exists, however, that an expert in a design defect case have actually
designed and built the available safer alternative design in order to be
qualified to testify to a safer alternative design.  See Gen. Motors
Corp. v. Sanchez, 997 S.W.2d 584, 592 (Tex. 1999) (holding expert qualified
to testify to safer alternative design, upholding jury finding of design
defect, recognizing that expert was qualified to testify concerning safer
alternative design, and stating that “the plaintiffs did not have to build and
test an automobile transmission to prove a safer alternative design”); Gen.
Motors Corp. v. Burry, 203 S.W.3d 514, 527 (Tex. App.—Fort Worth 2006, pet.
denied, pet. abated) (rejecting contentions that expert in design defect case was
not qualified because he “‘last worked in the automotive industry over twenty
years ago and has no experience with side airbags’” and “‘never ran a crash
test with side impact airbags, never designed a side impact airbag, never
designed a vehicle with side impact airbags, and never wrote any papers about
side impact airbags’”); see also MCI Sales & Serv., Inc. v. Hinton,
272 S.W.3d 17, 30–31 (Tex. App.—Waco 2008) (same, also holding “the Plaintiffs
did not have to build and test a prototype to prove a safer alternative
design”), aff’d, 329 S.W.3d 475 (Tex. 2010), cert. denied, 131 S.
Ct. 2903 (2011).  Indeed, the Majority Opinion holds that Hinds’s testimony
constitutes no evidence specifically because it was not based on testing of a
0.14-inch stretched acrylic windshield or a 0.10-inch monolithic polycarbonate
windshield in a Bell 407.  But I do not address these issues because, even
excluding Hinds’s testimony, more than a scintilla of evidence exists concerning
the safer alternative windshield design element of question 6 so that the trial
court did not err by submitting the question to the jury.





[33]Tom Gailey—Bell’s
expert on the structure of the Bell 407, a Bell employee who had worked for
Bell for twenty-three years at the time of trial—testified that in the early 1980s,
Bell manufactured and sold Bell 222 helicopters with bird-impact resistant windshields
in the United Kingdom because, at that time, the UK required bird-impact
resistant windshields.  Gailey testified that he was not sure if the Bell 222
bird-impact resistant windshield was polycarbonate; “it may have been.”  Since
1975, European regulations have required bird-impact resistant windshields on
helicopters weighing 6,000 pounds or more; the Bell 407 weighs 5,500 pounds.  

 

Steven
Webster, Bell’s director of advanced technologies and processes, testified that
Bell began manufacturing the Bell 222 with the heated bird-proof window
assemblies in 1976 for sale in Europe but did not put that windshield in the
Bell 222s being sold in the U.S.  

 

Gailey
testified that Bell had also manufactured a bird-impact resistant windshield
for the Bell 609; it was a “two-ply polycarbonate with an adhesive – it[’]s
called PVB adhesive—between the two plies of polycarbonate.  And then there’s a
ply of tenth-inch glass on the outside, and it also has a layer of adhesive
between it and the outer layer of polycarbonate.”  The polycarbonate layers of
the Bell 609 are each approximately one-fourth-inch thick, that is, 0.25 inches
thick.  The entire bird-impact resistant windshield for the Bell 609 is 0.75
inches thick and weighs approximately thirty pounds per side of the front
windshield.    

 

Webster
testified that in the 1970s, Bell also manufactured a UH-1 helicopter with a
0.25-inch monolithic polycarbonate windshield.   

 

Steven
Scott Cline, a project engineer who had worked for Bell for twenty-eight years
at the time of trial, testified that in 1997 and 1998, Bell was manufacturing
bird-impact resistant windshields for military helicopters.  The windshields
were made of stretched acrylic with a hard coating applied.  

 





[34]Webster testified
extensively about the results of an “Abrasion Resistant Canopies” study (ARC
study) that Bell had conducted and concluded in 1994. The study worked with
coatings for windshields and documented Bell’s discovery of a coating for
polycarbonate that addressed the UV protection issues, the rain shedding
issues, the chemical resistance issues, and the scratching issues sometimes
encountered with the use of polycarbonate windshields.  Webster testified:

 

Q.  Okay.  In your
ARC study in ’94, which was three years before this Bell 407 was manufactured,
you determined that you had coatings that would enhance UV protection, rain
shedding, chemical resistance and protection against scratching, didn’t you?

 

A.  Yes.

 

Q.  And that included
the coated polycarbonate, correct?

 

A.  Yes.

 

Q.  Okay.  So in ’94,
you had a coating that you could put on, including polycarbonate, that was
satisfactory to you in dealing with these problems, didn’t you?

 

A.  It addressed all
those problems, yeah, trying to make it better.

 

Q.  Three years -- three
years before -- because those are your only criticisms of polycarbonate.  So
y’all had that solved in ’94, three years before this helicopter that two of
these people’s family members died in was manufactured, correct?

 

.
. . .

 

A.          
 This
technology was available for many years.

 

Q.  My point is, you
had a satisfactory coating that solved the criticisms you had for polycarbonate
three years before this aircraft was manufactured that these people crashed in,
correct?

 

A.  It addressed
those issues, yes.

 

Q.  Okay.  So now all
that’s left is, would the polycarbonate have stopped the bird or not, correct?

 

A.  I’m – I’m not –
I’m not going – I can’t answer those questions for you –

 

John Raffo, Appellants’ coatings expert, identified
several different coatings for polycarbonate that were available prior to 1997
and would have worked well on a 0.10-inch polycarbonate windshield for the Bell
407.    





[35]According to Bell’s
expert Dr. Gary Thompson, the bird-impact resistant windshield that Bell placed
in the Bell 222 in 1976 weighed twenty-six pounds, only eighteen pounds heavier
than the existing as-cast acrylic windshield in the Bell 407.  

 

Concerning
the weight of polycarbonate, one of Appellants’ experts Anthony Bosik, an
aeronautical engineer and principal in Bosik Consultants Limited, the company
that operates the National Research Council bird cannon, testified:

 

Q.  Briefly, let’s
talk about the different weights between the materials, the substance.  This is
still – we’re still in the 1976 report [the 1976 report prepared for the U.S.
Army was admitted into evidence as Plaintiffs’ Exhibit 104].  What would be
your response to the criticism that polycarbonate is much weightier and would
be much heavier?

 

A.  It is not, it is
just slightly heavier.

 

Q.  Okay?

 

A.  As one can see,
12.7 versus 13.8.

 

Q. And this was known
back in at least since 1976, and has everyone really kind of known that all
along?

 

A.  Yes.  

 

The 1976 report
prepared for the U.S. Army contains the following abstract:

 

Bird impact results graphically
demonstrated that the polycarbonate prototype provided the superior resistance,
i.e., resistance to bird strikes at speeds up to 120 knots while the standard
acrylic windshield was incapable of defeating a bird strike at the UH-1 [a Bell
helicopter] cruising speed of 90 knots.

 

          In general,
the superior mechanical properties and the flight worthiness of the coated
polycarbonate configuration have been demonstrated.

 





[36]Webster testified
that once Bell started working on it in 1999, they formed the Bell 407
polycarbonate bird-impact resistant windshield in about two months.  Allan
Allman, a staff engineer who had worked for Bell for a total of thirty-eight
years at the time of trial, testified that in 1999, Bell had installed a
0.10-inch monolithic polycarbonate windshield in a Bell 407 and admitted that
there were no structural changes to the Bell 407 prior to installation of the
polycarbonate windshield.  

 

Gailey
also testified that since the accident at issue in this case, Bell had manufactured
a Bell 407 with a polycarbonate windshield and that it had not required any
changes to the structure of the helicopter.  

 

Webster
testified:

 

Q.  Well, we’ve heard
in this case about, well, if you want to put a polycarbonate in a light
helicopter you’ve got all these structural issues.  Tell me what structural
changes were made in the 407 that the military is flying around with right now
with a polycarbonate windshield in it?

 

A.  Mr. Fisher, I can’t answer that.

 

Q.  You can’t?

 

A.  No, sir.

 

Q.  But do you –
assume with me that that’s one of the issues in this case, that’s been made in
this case, is you can’t put polycarbonate in these things because it might come
out of the structure.  It might – if it stops the bird, the whole windshield is
going to come out, you’re going to have to change the whole structure.

 

A.  Not necessarily.

 

.
. . .

          

Q.  But my point is
this:  And that is, you can’t tell the jury that any structural changes had to
be made to the 407 to put the polycarbonate windshield in it, can you?

 

A.  There were no
structural changes made to the OH-58D or the 407 in trying to put a
polycarbonate windshield in it.  

 





[37]Concerning
the structural changes allegedly necessary to the Bell 407 to support a
bird-impact resistant windshield, Allman testified:

If you want to be able to take this load [a bird-impact
resistant windshield in a Bell 407] you’ve got to get it back to the middle. 
You’ve got to take all the energy – they call it sheering out.  So what you do
is you add a bunch of weight, which I have never calculated – and as I said in
my deposition hundreds and hundreds of pounds.  I don’t know the exact weight
and – it’s a lot.  Anyway, you take whatever that weight is, and you put it
here.  And then you have to get that so it will support that bird windshield so
it will be bird proof. 

Webster
intimated that the structure of the Bell 407 would have to be “beefed up” if
the existing 0.10-inch as-cast acrylic windshield were replaced with a
0.10-inch monolithic polycarbonate windshield, but he could not say what
structure needed to be “beefed up.”  

 





[38]Raffo testified that
a polycarbonate windshield could have been made as early as the 1970s; a
monolithic polycarbonate replacement windshield for the Bell 407 could have
been manufactured by Sierracin for approximately $2,000 to $3,000.  Raffo
testified that the cost of as-cast acrylic [the material used in the Bell 407
helicopter’s windshield] and polycarbonate are “roughly similar in costs.” 
Bosik testified that “polycarbonate and as-cast acrylic are both the same
costs.”  Webster testified that although Bell did “nothing” to develop a
polycarbonate windshield in the Bell 407 from 1976–1994, “cost was not a
factor” in Bell’s decision, “[e]specially on something as inexpensive as a
polycarbonate product.” 

 





[39]Dr.
Warren Wandel, Bell’s accident reconstruction expert, agreed that it was
undisputed and that Bell’s experts agreed that had a 0.10-inch polycarbonate
windshield been in the Bell 407 at issue, the windshield would not have broken
when impacted by the vulture.  





[40]Bosik
testified that “polycarbonate is able to absorb a lot more impact, because it
is more flexible.  It deforms more during the impact and is therefore able to
absorb more of the energy than, let’s say, the acrylic.”  Bosik opined that
polycarbonate transparencies are substantially more resistant to bird impact
than as-cast acrylic transparencies; “for a bolted edge situation the
polycarbonate gives you about three times the impact resistance of as-cast
acrylic,” and for a clamped edge situation, the impact resistance of a
polycarbonate frame is even significantly higher.   

Raffo testified that “[p]olycarbonate is the most
impact-resistant plastic polymer that is used in aircraft transparencies.  It’s
efficient because it has a good impact resistance at a thin thickness, which
means that the weight is reduced.”  Polycarbonate windshields were used in the
F-16 starting in the mid-1970s.  





[41]Raffo
testified that “[f]rom an impact point of view, as-cast acrylic is the least
resistant material.  Stretched acrylic would be the next strongest material,
and polycarbonate would be the ultimate.”  





[42]Bosik testified that
in 1978, he published a study on bird impacts on monolithic aircraft
windshields where he tested the velocity necessary for a bird to penetrate
as-cast acrylic, stretched acrylic, and polycarbonate windshields.  His study
was introduced into evidence as Plaintiffs’ Exhibit 98.  Based on the tests he
conducted, in the late 1970s Bosik participated in the development of a
mathematical equation to predict penetration velocity of these materials based
on the thickness of the material and the weight of the bird being fired at it. 
Bosik read from a 1976 report that the U.S. Army had produced concerning tests
it had done on the Bell UH-1 helicopter and that it had provided to Bell in
1976.  The report concluded that “[b]ird impact results graphically
demonstrated that the polycarbonate prototype provided the superior
resistance.”  Based on the Army’s tests in 1976 and Bosik’s mathematical equation,
a 0.10-inch polycarbonate windshield would have defeated a 120-knot strike by a
four-pound bird.   

 

Concerning
whether a stretched acrylic windshield design or a polycarbonate windshield
design would have in reasonable probability prevented the approximately
four-pound vulture from penetrating the windshield of the Bell 407, traveling
at a maximum speed of 120 knots in such a way that it struck and killed Captain
Damian or knocked him unconscious, Bosik testified:

 

Q.  And what did you
conclude with respect to the penetration velocity of either stretched acrylic
or polycarbonate in this particular accident?

 

A.  Basically the
stretched acrylic in the same thickness probably could have survived [a] 100
knot test.  But stretched acrylic is a feasible material as well as far as the
windshield goes.  The thickness would have to be increased a little bit from
what it is, to an estimated .14 inches.

 

Q.  So for stretched
acrylic they’d only have to go from .1 to .14?

 

A.  For polycarbonate
a .1 inch thick, which is the same thickness, would increase the penetration
velocity from about 60 or 70 to about 200 knots.

 

Q.  So for the
polycarbonate material, as far as the thickness that we see here with respect
to the windshield, it – it could have been the same size?

 

A.  Yes.

 

Q.  And that was
feasible at the time this helicopter was manufactured?

 

A.  Yes.  

 





[43]Allman, one of Bell’s
staff engineers, was asked what would happen if a polycarbonate windshield was
placed in a Bell 407, a bird hit it, and the polycarbonate did absorb the
energy and prevent the bird from penetrating the windshield.  He answered:

 

A.  If you put a
large enough polycarbonate window and mount it on the Bell structure so that
the bird’s energy will be absorbed, that energy that it absorbs is past the
point that the structure can handle and it will buckle, then the windshield
will break loose, because the structure is given away underneath the load of
the windshield.

 

Q.  So windshield
structure buckles and windshield breaks loose; is that fair?

 

A.  Yes, sir.

 

Q.  Okay.  Now, tell
the jury every test that you’ve run, every equation you’ve done, every bird
Bell’s fired, you or Bell has fired at a tenth of an inch polycarbonate
windshield in a 407 structure.

 

A.  Mr. Webster
answered that, and my answer will be the same.  Is we have not done any
bird-strike tests.

 

.
. . .

 

Q.  So wouldn’t you
agree, sir, that – that you or Bell have performed no tests, done no studies,
done no experiments to support the opinions that you’re giving today that the
windshield will come out?

 

A.  We have done no
tests on the 407 to support that opinion. 

 





[44]Bosik testified
regarding Bell’s testing in preparation for this litigation.  He explained that
to form its opinion that a 0.10-inch polycarbonate windshield would not stay in
the windshield frame following a bird strike, Bell mated a polycarbonate square
to a square frame made of wood, hoisted a fifty-pound lead weight up by a
crane, and dropped it on the framed polycarbonate.  The piece of polycarbonate
stayed intact but was pushed down through the wooden frame holding it.  Bosik
explained that the load Bell used to do this test was improper because the lead
“in no way simulates a bird. . . .  Because the consistency of it is not
correct. . . .  For a first approximation of a bird, you would assume a liquid,
as opposed to a solid.  So a bird is more like an orange than an apple.”  Bosik
said that Bell did not perform the testing to ASTM’s standards for bird impact
testing “because they should be using a bird or a simulated bird and that
should be conducted at the right speed.  In addition to that, it should be a
representative of structure and it should be conducted at the right attitude;
that is, the same flight path as the aircraft would be.”  Additionally, Bell’s
testing utilized a wooden frame, rather than the steel-type frames used in the
Bell 407 and also no evidence exists that the mating with the wooden box
utilized an extra 1.5 inch interface as required by Hinds’s design. 
Consequently, Bosik concluded, “I don’t think this test has any validity
whatsoever.”  

 

          Dr. Gary
Thompson testified for Bell that the bird in this case hit the Bell 407 with
2230 foot pounds of energy.  He said that amount of energy is what Bell was
trying to replicate in its testing by dropping fifty pounds of lead on a square
of polycarbonate.  Dr. Thompson testified:

 

Q.  You’re from east
Texas.  Did you ever hit lovebugs on your windshield?

 

A.  Yes, I have.

 

Q.  When you hit them
on your windshield, which way does the bug shoot up?  Which way did the
starburst of the bug happen?

 

A.  Typically goes up
with the air flow.

 

Q.  It doesn’t stay
intact, obviously, right?

 

A.  Most bugs will
not, no.

 

Q.  Because bugs are
partially liquid, right?

 

A.  Yes.

 

Q.  Like a bird?

 

A.  Yes.

 

Q.  How much liquid
is in that 3.5 pound vulture?

 

A.  I am not a
vulture expert, I couldn’t tell you that.

 

Q.  Probably a lot
more than in this, say, lead sack that they have duct taped up, right there?

 

A.  I would have to
agree with that, yes.  





[45]Recall that Allman,
Gailey, and Webster, all testified that in 1999, Bell had installed a 0.10-inch
monolithic polycarbonate windshield in a Bell 407; no structural changes to the
Bell 407 were required prior to the installation of the windshield.  

 





[46]Allman admitted that
although Bell had, subsequent to this crash, put a polycarbonate windshield on
a Bell 407 that was forwarded to Air Logistics, Bell had not warned Air
Logistics of Bell’s opinion that a bird strike would cause the window structure
to collapse and the windshield to enter the cockpit.  He was then asked:

 

Q.  So back in ’99,
you know, or you told this jury that it[’]s common sense to know that if a bird
hits a polycarbonate it’s going to knock it out of the structure and it’s going
to be potentially dangerous or fatal to the pilot.  You sent it down to Air
Logistics, had them fly around in it, you didn’t tell them about it, and you
didn’t even change the structure on the 407 for that first windshield, did you?

 

.
. . .

 

A.  When we sent it down to Air Logistics, we did not
and are not sure now that it endangers anyone.